INTERSTATE COMMERCE COMMISSION *v.* NEW
YORK, NEW HAVEN & HARTFORD RAILROAD
CO. ET AL.

No. 15.   Argued October 17, 18, 1932.—Decided November 21, 1932.

*Mr. Thomas M. Ross,* with whom *Messrs. Charles W. Needham* and *Robert E. Freer* and *Mrs. Mary B. Linkins* were on the brief, for petitioner.

*Messrs. John L. Hall* and *Charles O. Pengra* for respondents.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The New York, New Haven & Hartford Railroad Company, and other railroad companies subject to its control, the group making up together the New York, New Haven and Hartford System, and collectively described as " the carrier," petitioned the Supreme Court of the District of Columbia for a writ of mandamus directed to the Interstate Commerce Commission and commanding the Commission to include the value of the carrier's interests in the tracks of the New York and Harlem Railroad Company from Woodlawn to Forty-third Street in the City of New York, in the Grand Central Terminal in that city, and in the land and buildings of the Boston Terminal Company, as part of the inventory and valuation required by § 19a of the Interstate Commerce Act. 37 Stat. 701, c. 92; 49 U. S. C., § 19a. The Supreme Court of the District dismissed the petition. Its judgment was reversed by the Court of Appeals, 60 App. D. C. 403; 55 F. (2d) 1028, and a writ of certiorari brings the case here.

The carrier operates lines of railroad in Massachusetts, Rhode Island, Connecticut and New York. Its tracks enter the state of New York at or near Port Chester, and at Woodlawn connect with the tracks of the New York and Harlem Railroad Company, now operated under lease by the New York Central System. From Woodlawn south to the Grand Central Station, a distance of about twelve miles, the carrier's passenger trains run over the Harlem tracks; and the carrier and the Central use the station in common. At Boston, Massachusetts, the carrier's tracks connect with those of the Boston Terminal Company, the owner of the South Station in Boston; and

the carrier has the use of that station in common with other lines. The facts bearing upon its interest in the Harlem tracks and the Grand Central Terminal will be considered first, and afterwards those bearing upon its interest in the terminal at Boston.

On March 17, 1848, an "agreement and contract of transportation" was entered into between the New York and Harlem Railroad Company and the New York and New Haven, a predecessor of the carrier. By this contract, the Harlem granted to the New Haven the right " to run their trains, engines and cars for the transportation of passengers, mails, expresses, freight, etc., over the track or tracks of the road of the New York and Harlaem Railroad Company from the point of junction aforesaid to and into the city of New York." The New Haven was to furnish its own haulage and to pay the Harlem " as full compensation for the use and occupation of their track or tracks as aforesaid, a certain sum for each passenger transported," and a portion of the tariff rates received for the transportation of express matter and the mails. Compensation was to be adjusted every five years by agreement, or in the event of failure to agree, by arbitration. Following the execution of this contract, and on March 29, 1848, the legislature of New York passed an act to amend the charter of the New York and Harlem Railroad Company. In § 6 of that act, it confirmed the validity of the contract with the carrier's predecessor. " The New York and New Haven Railroad Company is hereby authorized to enter upon and run their cars and engines for passengers, freights, mails, expresses and other business, over the road of the New York and Harlem Railroad Company, from the point of junction of the roads of said companies at or near William's Bridge, in the County of Westchester, to the City of New York, and as far into the said city as the said Harlem Railroad may extend, upon such terms, and to such point as has been or may

hereafter be agreed upon by and between said companies, a copy of such agreement or agreements to be duly authenticated and filed in the office of the Secretary of State of this state." Promptly upon the enactment of this statute, the New Haven connected its line with the tracks of the Harlem, and ever since that time has run its trains over them into the City of New York. The Harlem on April 1, 1872, leased its road to the New York Central for a term of 401 years, the lease reciting that it was subject to the contract between the Harlem and the New Haven.

From a statement of the facts as to the carrier's interest in the tracks south of Woodlawn we pass to a consideration of its interest in the Grand Central Terminal. An agreement described as a "tripartite lease" was entered into on November 1, 1872, between the Harlem, the Central and the New Haven whereby the Harlem leased to the other roads the use of certain parts of the Grand Central Depot (a building since then destroyed) and the adjacent yards. On July 24, 1907, this agreement was superseded by another tripartite lease between the same parties. The Central agreed at its sole expense to acquire the lands and make all the changes necessary for the construction of a new station, the present Grand Central Terminal. Acting for itself and the Harlem, it leased to the New Haven during the term of the New Haven's charter (i. e., in perpetuity) the "use, in common with the Central Company, subject to all the provisions of this agreement, of the said Railroad Terminal for the accommodation of the traffic of the New Haven Company, other than freight traffic," with the proviso that the New Haven's right to the use of the terminal should in no event exceed fifty per cent of the maximum capacity. As "compensation for the premises hereby demised," the New Haven was to pay to the Central that proportion of four and one-quarter per cent interest on the cost of construction and of the annual expenses for

maintenance and operation " which the use of the Railroad Terminal by the New Haven Company bears to the entire use thereof." The terminal was to be under the direction of a terminal manager appointed by the presidents of the Central and New Haven Companies and removable by either.

Next in order is a statement of the interest of the carrier in the terminal at Boston. By an act of the Massachusetts legislature, approved June 9, 1896, the Boston Terminal Company was incorporated " with power to construct and maintain a union passenger station in the southerly part of the City of Boston, and to provide and operate adequate terminal facilities for the five railroad companies entering the city and for the accommodation of the public." These railroad companies, including the New Haven, were severally authorized to subscribe for the capital stock in equal amounts. Upon the completion of the proposed improvements, the five railroads were to use the station and its terminal facilities for all their terminal passenger business in Boston, and were to pay to the Terminal Company the amounts necessary to satisfy the expenses of the corporate administration and of the maintenance and operation of the station and other facilities, together with interest on the bonds and a dividend not to exceed four per cent on the capital stock. The payments by the several roads were to be proportioned to the use, and were to be deemed to be a part of their operating expenses. At the time of the trial, the New Haven, having succeeded to the interests of some of the other roads, held in its ownership or subject to its control eighty per cent of the Terminal stock, the remaining twenty per cent being controlled by the Central.

With this statement of the facts as to the carrier's interests in the tracks and terminals, we reach the question whether the Commission was under a clear duty, enforce-

able by mandamus, to include those interests with a specific valuation in the statutory inventory.

By § 19a of the Interstate Commerce Act (49 U. S. Code; Act of March 1, 1913, c. 92, 37 Stat. 401, as amended), there is laid upon the Commission the colossal task of preparing an inventory and valuation of the property of the railroads of the United States.[1]

Subdivision *a* of the section is sweeping in its extension.

" The Commission shall . . . investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this act." It " shall make an inventory which shall list the property . . . in detail, and show the value thereof as hereinafter provided, and shall classify the physical property, as nearly as practicable in conformity with the classification of expenditures for road and equipment, as prescribed by the Interstate Commerce Commission."

Subdivision *b* contains directions as to the method of showing values and thus fulfils the promise of subdivision *a* that such directions as to form will be " hereinafter provided."

The provisions are distributed into five classes.

Under the heading " first," there is a command to the Commission to " ascertain and report in detail as to each piece of property, other than land, owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained and the reason for their differences, if any."

For convenience of reference this part of the directions that are grouped under the heading " first " will be described as number one.

---

[1] The events leading up to the adoption of the act and the public policy it was designed to further will be found clearly stated in Sharfman, The Interstate Commerce Commission, vol. 1, pp. 117 to 137.

Under the same heading there is, however, another part which will be identified as number two.

"The Commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier and an analysis of the methods of valuation employed, and of the reasons for any differences between any such value and each of the foregoing cost values."

The division described as "second" contains directions for a report of the original cost and present value of lands, rights of way and terminals separately from improvements.

The "third" division deals with the valuation of property held for purposes other than those of a common carrier; the "fourth" with the financial history and corporate structure of the carriers; and the "fifth" with the ascertainment and valuation of governmental aids or gifts.

By subdivision c the Commission is empowered, except as otherwise provided, "to prescribe the method of procedure to be followed in the conduct of the investigation, the form in which the results of the valuation shall be submitted, and the classification of the elements that constitute the ascertained value."

The Commission at an early stage in its labors was confronted with the problem as to the proper method of valuation where there was a division of interest between the ownership and the use. The first exposition of its views upon that subject will be found in a decision made July 31, 1918, in the matter of the valuation of the Texas Midland Railroad, 75 I. C. C. 1, 20, 121, 122. The substance of its ruling there was that where property is jointly used by two owners, the details will appear in the inventory of each; that where property is owned by one carrier, and exclusively used by another, the details will appear in the inventory of the owner, but in addition

the value will be shown in the inventory of the user; that where a carrier owns and uses property but gives to some other carrier not the exclusive use but only a qualified use in common with itself, such as the right to use its tracks, the fact and nature of the use will be described in the inventory of both the owner and the user, but the value of the property will be reported in the inventory of the owner solely. " The physical property," said the Commission (p. 124), " is not changed by this dual use." " The law requires the ascertainment of values for property owned or used, but not the value of the use." 75 I. C. C. 24. Despite the comprehensive command to report the value of all the property owned or used by any common carrier subject to the act, there is still, so the Commission held, some latitude of judgment as to the extent to which the component elements of worth are to be separated, and a specific valuation allocated to each.

The Commission has steadfastly adhered to these principles in the fulfilment of its task. Along the lines there charted, a thousand inventories and reports have been made, it is said, during the nineteen years that have gone by since the Valuation Act was passed. Cf. Report of the I. C. C. for 1931, p. 68. In only one instance, except this, has the method, so far as we are informed, been challenged in the courts as a departure from the statute, and there mandamus was refused. *Kansas City Southern Ry. Co.* v. *Interstate Commerce Commn.*, 6 F. (2d) 692. Cf. Matter of Kansas City Southern Ry. Co., 75 I. C. C. 223, 234. What was done in this inventory has at least that sanction of validity which is born of long administrative practice. *United States* v. *Moore*, 95 U. S. 760, 763; *Logan* v. *Davis*, 233 U. S. 613, 627; *Brewster* v. *Gage*, 280 U. S. 327, 336; *Fawcus Machine Co.* v. *United States*, 282 U. S. 375, 378. In conformity with that practice the Commission overruled the protest of the

carrier, and held that the trackage rights over the Harlem roadbed and the rights of user in the New York and Boston terminals would be reported in the inventory as valuable rights or interests belonging to the carrier, but without assigning to them a specific value separate from the value given to the system as a whole. Like " going concern value " and that of many other intangibles, the value of these qualified privileges of user, falling short of ownership or full possession of the physical thing, was not excluded altogether as an element to be reflected in the ultimate appraisal. Cf. Texas Midland R. R. Case, 75 I. C. C. 1, 69. What was held was no more than this, that the contribution of such factors was not a separate thing of value to be segregated from all the other values inhering in a unified system of railroad operation, and ticketed by itself. "We report all the costs which are specifically named in the valuation act, on which we can obtain tangible data, and we find a single sum value after a consideration of those tangible costs and the intangible elements of value which inhere in a fully organized and operating property." Cf. *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 165; *McCardle* v. *Indianapolis Co.*, 272 U. S. 400, 414. These are the words of the Commission in answering the carrier's objection that the going concern value had not been separately stated. Its answer might have been the same if it had been meeting the objection that privileges of user, incapable of appraisal in terms of the cost of the thing used, had been described in the inventory without specific appraisal of the value of the use.

We are thus remitted to the question whether this method of classification, accredited to us, as it is, with all the authority springing from administrative practice, is a departure from any duty created by the statute, or, more accurately, from any duty so peremptory and unmistakable as to be enforceable by mandamus. True indeed it

is that by the express direction of the statute there is to be a valuation of all the property owned or used by any carrier subject to the act. We do not travel very far upon the road to a solution of our problem by repeating that command. A valuation there is to be, for so it is commanded in subdivision *a*, but only " as hereinafter provided," and to discover what is " hereinafter provided," we must look to subdivision *b*. If there is nothing in subdivision *b* calling for the separate classification and appraisal of the value of a right to use, then the duty so to classify and appraise is not created by the statute, and certainly not created in any clear and peremptory way.

We must distinguish between the ultimate result to be attained by the preparation of the inventory and the details of form and method prescribed for its attainment. To admit that there must be a valuation of the whole is not equivalent to admitting that a separate and specific valuation must be allocated to every kind of property interest embraced within the whole. To what extent a group of interests shall be resolved into its elements is thus a question of degree. If a barren literalism were to guide us, subdivision could be carried down to the dimensions of an atom. We are not to push the mandate to " a drily logical extreme." *Noble State Bank* v. *Haskell*, 219 U. S. 104, 110. A roadbed and a terminal are property, but so are license privileges, and contracts for supplies, and rights *in personam* as well as those attaching to a *res*. Was it the meaning of the lawmakers that rights and interests such as these were to have a value specifically assigned to them apart from their relation to the " going value " of the business? Not even counsel for the carrier would have us go so far. By concession there are forms of property which are to be considered by the Commission as contributions to a larger whole, and not as things apart. We were told upon the argument that the interests in the Harlem tracks might have been omitted from the inven-

tory if they had been licenses, and nothing more. Specific valuation became necessary because, in the view of counsel, the interests had their basis in a franchise or an easement. A like distinction was drawn in respect of the interests in the terminals. They might have been omitted from the inventory, however great their value, if the privilege of use had been derived from a contract giving rise to a mere license. The omission of a specific valuation became wrongful, it was argued, if the interests amounted to a title or estate. The Commission declined to go into these niceties. " It is . . . not necessary for us to determine whether the right of use in the carrier is best defined by reference to it as a license to use, an easement or a trackage right." We shall practise a like restraint, observing only in passing that the proper classification is obscure (*Union Pacific Ry. Co.* v. *Chicago, Rock Island & Pacific Ry. Co.,* 163 U. S. 564, 582, 583; *Union Pacific R. Co.* v. *Mason City & Ft. Dodge R. Co.,* 222 U. S. 237, 247, 248), and that the carrier by its own conduct has admitted the obscurity. In its annual reports to the Commission, starting in 1888 and including the year preceding the beginning of this suit, its interests in the Harlem tracks and in the New York and Boston terminals are reported under " class 5," which is described in the report as including " all tracks operated and maintained by others, but over which the respondent has the right to operate some or all of its trains. In roads of this class, the respondent has no proprietary rights, but only the rights of a licensee." What concerns us at the moment, however, is not the fitness or the unfitness of one classification or another. What matters for present purposes is the carrier's concession that the command to prepare an inventory in which all the property shall be valued does not mean that every property interest shall be separately valued. Something, then, is to be abated from the dictates of an implacable literalism allowing no exceptions.

At one point or another a line of division has to be drawn between the property to go in and the property to stay out. The location of the line will involve considerations of legislative intention and administrative judgment. Division being necessary, did the members of the Commission ignore a plain and certain duty in making it where they did?

In our summary of the statute, the provisions under the heading " first " of subdivision *b* were separated into two parts, described as numbers one and two. Part number one was intended to procure the valuation of a railroad considered as a physical thing. Every " piece of property " is to be inventoried, and with reference to every "piece" so inventoried the Commission is to ascertain the investment in the thing, and the cost of producing it anew. The factors have been made familiar by historic litigations. *Smyth* v. *Ames,* 169 U. S. 466; *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U. S. 461. But the statute does not mean that there shall be a duty to appraise in terms of cost if the interest to be appraised is such that the cost of the thing is without relevance as a criterion of the value of the interest. There can be no plain and certain duty, enforceable by mandamus to proceed to a valuation that will be a snare or a deception. Here the New Haven has not invested anything in the roadbed or the terminals. It is not affected for good or ill by fluctuations in the cost of building them anew. Whatever the legal category in which its interests are to be placed, the value is independent of the cost of the thing in which those interests inhere. Plainly untenable is its contention that the amount to be allowed to it is the proportion of the cost value of the property that would result from a division of such value between itself and the Central in the ratio of use. 30 I. C. C. Val. Rep. 1 at pp. 31, 33. Such a method of appraisal ignores the millions of dollars payable year by year in perpetuity to keep

the privilege alive. It treats as an investment what is merely a contingent debt. The value of the trackage rights, whether one views them as amounting to a license or an easement, is not the cost of the roadbed, but the difference between the value of the use and the rent to be paid therefor. The value of the interests in the terminals, whatever the proper name for them, must be measured in the same way. Today, under the Transportation Act of 1920, the Commission may compel a carrier owning terminal facilities to grant to other carriers the use of such facilities, including main line tracks for a reasonable distance, in return for a compensation prescribed as just and reasonable. 49 U. S. Code 3 (4). For all that appears the rights now in controversy might continue to be enjoyed though the agreements set forth in the record were to be rescinded or annulled, and enjoyed at a smaller cost, if a rental lower than the existing one were to be fixed by the Commission. Be that as it may, the value for the New Haven is not the value of the thing or piece of property owned or used, or of any fractional interest therein. The value for the New Haven is the value of the use, which is measured by the difference between the rent payable under the lease and the fair and reasonable rent that would be the compensation payable to the owner in the absence of agreement. There is nothing to indicate that the carrier laid testimony before the Commission as to what this difference would be. Cf. Texas Midland Railroad Case, 75 I. C. C. 1, 24. It took its stand upon the position that *pro tanto,* in proportion to its use, it was the owner of the fee.

The argument will be made, however, that the Commission is inconsistent. Appraisal on the basis of cost has been thought to be suitable where the lessee has a possession exclusive of the owner. Why, then, is it not suitable also where the interest of the lessee is in common with the owner, and this though the interest fluctuates from

day to day with the measure of the use? No doubt the practice of the Commission has been what the argument assumes. The practice has been, as we have already pointed out, when the possession of a lessee is exclusive of the possession of the owner, to inventory leased property in the name of each of them, setting down for each the original and the reproduction cost of the subject matter of the lease, setting down the fact of use, and making allowance thereafter for any increase or deduction due by reason of such use when costs are readjusted and corrected to express the final values.[2] Never upon the face of the inventory has there been a specific valuation of the interest of the lessor and that of the lessee considered as estates in the land and structures and apart from the valuation of the property demised. The Commission has been unfaltering in its adherence to the principle that the value to be reported is the value of the thing, and not of every interest connected with the thing. Whenever the nature of a lease is such that the cost of what is leased may appropriately be taken as an index of the value of the leasehold, the inventory and the valuation have been made upon that basis. Whenever the interest has been such that cost is not an index, the test of cost has been rejected. In the application of these methods there has been no discrimination between this carrier and others. In the inventory now in controversy there are properties owned by the New Haven, and wholly leased to other lines, and properties owned by other lines, and wholly leased to the New Haven. For all these properties the reproduction cost is set forth in the inventory of the New Haven System without specific appraisal of the value of the reversion as an interest subject to the lease, or the value of the lease as an interest distinct from the rever-

[2] The practice is explained by Mr. Esch, formerly Valuation Analyst of the Commission, in an article "Valuation of Leased Railroad Property." 33 Yale L. J. 272, 276, 277.

sion. The New Haven itself is thus the beneficiary of the principle that the inventory is to set forth the value of the thing, and not of every interest touching the enjoyment of the thing.

We recur, then, to the question why the method of appraisal that has been thought to be appropriate where a lessee has the sole use may not be followed here also where in common with the owner the lessee has an undivided interest in the use of tracks and terminals in return for yearly payments. Perhaps a sufficient answer is that it is never mandatory on the Commission to value the interest of any lessee on the basis of the cost, though such a method may in certain circumstances be appropriate as an exercise of discretion. But other answers are available, if this be thought inadequate. There can be no doubt that even in its application to a sole lessee, the method of valuing a lease on the basis of the cost of the property demised is at best a rough and ready approximation. Even so, the formation of a rate base by treating a lessee as owner and measuring a fair return of income as a percentage of the cost may yield a reasonable average of accuracy where the interest of the lessee is constant and the rentals that it pays are excluded from the computation of its operating expenses. Such exclusion is required by the accounting rules of the Commission where the lessee has the sole use. The practice is different, however, where a carrier has the benefit of joint-facilities. There the rentals paid for the use of the facilities are part of the operating expenses, and were so treated in the case at hand. This treatment of them has the support of statute (Transportation Act, 1920; 49 U. S. C., § 15a [1])[3] as well as of administrative practice. A car-

---

[3] " The term ' net railway operating income ' means railway operating income, including in the computation thereof debits and credits arising from equipment rents and joint facility rents."

There is a like direction in the act incorporating the Boston terminal.

rier receives a duplication of benefits if it is permitted to include its rentals as an operating expense while earning a return upon the value of an unincumbered fee.[4] Aside from this objection, a lease which gives to the lessee, not exclusive possession of the property demised, nor even a fixed share, but a share fluctuating from time to time with the variations of the business, is too uncertain and inconstant to be valued with even approximate correctness by the test of the cost of the property subjected to the use. The Commission was satisfied to adopt the formula of cost where the lease was such as to lead it to believe that the margin of error would not be inordinately large.[5] Nothing in the statute makes it mandatory to apply the same formula, inaccurate at best, to leases of a different nature if the margin of error would thereby be increased.[6] Nor is there anything in the objection that by force of § 15a of the Transportation Act, 1920, a form of inventory permissible under § 19a of the Valuation Act of 1913 is permissible no longer. The Act of 1920

---

[4] Esch, Leased Railroad Property, *supra,* at p. 274.

[5] " Not only is the matter of proportion of use at any particular moment largely speculative, but it varies from time to time." Esch, *supra,* at pp. 278, 279.

[6] Upon a hearing before the Senate Committee, Senator La Follette, the Chairman, inquired of a witness, Prof. Commons, as to the proper method of valuation where property was leased. The answer was in substance that such a case might be taken care of in either one of two ways, by valuing the property as if it were owned by the lessee or by making allowance for the rent as an operating expense, and that it would be the function of the Commission to determine the preferable method in any given situation. The members of the Committee apparently acquiesced. Senator La Follette adverted to the possibility of a double valuation if one railroad had the privilege of running its trains over the tracks of another, and added that, of course, only one valuation would be proper. Physical Valuation of Property of Common Carriers, Senate Committee on Interstate Commerce, 62nd Congress, 3rd Session, Senate Library, Vol. 15, No. 6, pp. 128 and 129.

authorizes the Commission to "utilize the results of its investigation under § 19a" of the Interstate Commerce Act for certain additional purposes "in so far as deemed by it available." 49 U. S. Code, § 15a (4). There is nothing in the new statute to suggest that earlier inventories are to be revised, or that forms of valuation lawful in the past are to be unlawful in the future.

What has been written serves, we think, to show that the interests in controversy are not affected by that part of subdivision b of the statute which we have identified as number one. The question remains whether a specific valuation is made mandatory by the provisions of the part identified as number two. "The Commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier and an analysis of the methods employed, and of the reasons for any differences between any such value and each of the foregoing cost values." The carrier did not build its case on that command in making proof to the Commission. It took the position, on the contrary, that it was an owner of the roadbed and the terminals in proportion to its use and made its proof accordingly. See Matter of New York, New Haven & Hartford R. Co., 30 Val. Rep. I. C. C. 1, 31, 32, 33. There can surely have been no breach by the Commission of an inflexible and certain duty in omitting from an inventory a separate and specific estimate of the difference between the value of the use and the rents reserved to the lessors when the protest of the carrier was silent as to what the valuation ought to be. The result will be the same, however, though this defect be overlooked. The command to report other elements of value does not impose a duty, inflexible and certain, to appraise the value of a use which is unrelated to the value of what is subject to the use. The ends to be attained are differ-

ent. They can be gathered from a report of the Senate Committee on Interstate Commerce submitted to the Senate in February, 1913. 62nd Congress, 3rd Session, No. 1290, p. 8. The report begins with a consideration of the three criteria of value that are stated in part one of subdivision *b*: first, original cost; second, cost of reproduction new; third, cost of reproduction, less depreciation. From these it passes to a consideration of the effect and purpose of part two, prefacing the discussion with the title " other values and elements of value; that is, intangible values." " This classification," the report continues, " provides for going value, good will value, and franchise value. Whether any or all of these values will be considered by the Commission or the courts in determining the fair value of the property, and if so, what importance shall attach to them is a matter for the Commission and the courts. Especially as to intangible values, the Commission and the courts are in a transition period. The elements of value which will finally constitute fair value for rate-making purposes are steadily narrowing. They are not expanding. No decision by Commission or court will stand which is ultimately found to be unfair to the public or to the common carrier. The committee has, it is believed, provided for ascertaining every element of value which, upon recognized authority, should be considered." Congress had no thought to tie the hands of the Commission by imposing a peremptory duty to classify in any particular way the factors supplementing or modifying the significance of cost, and to allocate to each a specific value. The report makes it clear that Congress did not know what those factors were, and that the Commission, guided by the courts, was to work out in its own way a practical and fair result. Whatever duty was imposed had its basis in a general admonition which left a wide and indefinite margin of judgment as to the method of obedience.

In the light of these considerations, the aim of the statute in bidding heed to be given to other elements of value than those of cost alone, is readily discerned. Its aim is to afford play for the correction .of the errors certain to result where the value of a railroad is identified with the cost of its component parts without reference to the values generated or extinguished by the union of the parts into a single and organic whole. Effects that are the resultant of two or more forces working in combination may be capable of appraisal when it would be difficult, if not impossible, to estimate the consequences of any one of the forces operating singly. For an illustration of this truth we have only to bear in mind the obscure and varied factors, psychical as well as physical, that enter into the creation of the " going value " of a business. Not infrequently the value of these intangibles will be an aggregate made up of elements too deeply interpenetrated for any specific figure to be set opposite to one of them dissevered from the others. What is true of " going value " is true of roadbeds and stations, of trackage rights and rights in terminals. As soon as one passes beyond an appraisal of the cost, the increments or the deductions involve estimates of relation, the parts being worthless or nearly so unless adapted to the whole. Not a mile of track would be worth the cost of reproducing it, nor a trackage right the rental, if there were not stations at either end. Not a station would be worth the cost of building it anew if' there were not roadbeds or tracks or trackage rights beyond. The final value set down in the report of the Commission shows that over and above the cost of reproduction less depreciation, something has been added, in appraising the property of the carrier, to express the value of the whole as distinguished from the total of the parts. Not even the depreciated reproduction cost, let alone something in addition, would

have been reported as the final value if the road had been viewed as a congeries of fragments. To argue that the Commission ignored these intangibles altogether because it failed to value them specifically is to miss the significance of the whole process of appraisal. Every trackage contract and every terminal use, in so far as it contributes to the unity of the system, is reflected in the final value ascribed to the physical things that are listed in the inventory. The Harlem trackage contract is there reflected, for the reproduction cost would cease to be a measure of the value if the trains stopped short at Woodlawn. The rights in the New York and Boston terminals are there, for again the reproduction cost would be of no avail as a criterion if there were no terminal facilities for passengers at Boston or New York. The question is not whether trackage rights and rights in terminals are interests that the Commission is at liberty to treat as nonexistent. The question is whether they are interests of such a kind that they must be specifically valued instead of being viewed as factors that enter by infusion into the lifeblood of the organism. If there is anything in the statute requiring values of that order to be separately stated, the carrier has not pointed to it. In the absence of such a duty, nothing in the report of valuation justifies a holding that any property interest was excluded altogether. " We have given careful consideration," said the Commission, " to all facts of record and pertaining to the value of the common-carrier property of the carrier as an organized, developed, well-maintained, seasoned property in operation as a going concern." Many diverse elements, reacting one upon another, have been fused in an act of judgment drawing its sustenance from all.

A word may yet be due with reference to those provisions of subdivision *b* of the statute which are set forth

under the heading "second." "Such investigation and report," it is there said, "shall state in detail and separately from improvements the original cost of all lands, rights of way and terminals owned or used for the purposes of a common carrier and ascertained as of the time of dedication to public use, and the present value of the same." The rights of way there in view are those that involve an investment of the moneys of the carrier, and result in the possession of the land itself, the roadbed on which the tracks are laid. *Georgia* v. *Cincinnati Southern Ry. Co.*, 248 U. S. 26, 28. They do not include the privilege of hauling cars for a rental over the roadbed of another. What is true of rights of way is true also of terminals. If the New Haven has no interest in the improvements constituting the roadbed and the terminal stations sufficient to require a specific valuation of its interests under parts one and two of subdivision "first," it has none sufficient to require such valuation under subdivision "second."

We do not go beyond the necessities of the case before us in shaping our decision. Whether an inventory such as this one, omitting a specific valuation of important rights and interests, gives full or adequate effect to the intention of the lawmakers, we are not required to determine. In later or collateral controversies that question may be pertinent. For the purpose of this case, it is enough to hold, as we do, that the duty of specific valuation, if it exists, has been imposed upon the Commission too vaguely and obscurely to be enforced by a mandamus. *United States ex rel. Redfield* v. *Windom,* 137 U. S. 636; *Wilbur* v. *United States ex rel. Kadrie,* 281 U. S. 206. One cannot rise from a study of the statute in the setting of its history and of the administrative practice under it and hold at the end an assured belief that the Commission has been commanded by the Congress to do the act omit-

ted.  Where a duty is not plainly prescribed, but is to be gathered by doubtful inference from statutes of uncertain meaning, " it is regarded as involving the character of judgment or discretion," (*Wilbur* v. *United States ex rel. Kadrie, supra*), and mandamus is thereby excluded.  The case at hand differs in essentials from *Kansas City Southern Ry. Co.* v. *Interstate Commerce Commn.*, 252 U. S. 178, where a specific, unequivocal command, removed after the decision by an amendment of the statute,[7] was laid upon the Commission to value a particular thing, and the Commission ignored the command to the extent of refusing to hear any evidence whatever..  The ruling in that suit has been explained in later cases, and confined to its peculiar facts.  *Interstate Commerce Commission* v. *Waste Merchants Association*, 260 U. S. 32, 35; *United States* v. *Los Angeles & Salt Lake R. Co.*, 273 U. S. 299, 311.

Public policy forbids that the work of the Commission in the fulfilment of the stupendous task of valuation shall be hampered by writs of mandamus except where the departure from the statute is clear beyond debate.  The report is not a stage in a judicial proceeding affecting this carrier or others.  " It is the exercise solely of the function of investigation." *United States* v. *Los Angeles & Salt Lake R. Co., supra,* p. 310.  The final valuations made in it will indeed be *prima facie* evidence against the carrier in proceedings under the Commerce Act.  49 U. S. C. § 19a (1).  Even so, the opportunity to contest them, if at any time they are introduced in evidence, is " fully preserved to the carrier, and any error therein may be corrected at the trial." *United States* v. *Los Angeles & Salt Lake R. Co., supra,* p. 313.  The valuation of the railroads of the country has been ordered by the Congress in

---

[7] See Act of June 7, 1922, c. 210, 42 Stat. 624.

the belief that this new " Domesday Book " will promote an important public purpose. Nearly twenty years have passed since that belief found expression in the enactment of the statute, and the work is still unfinished. Report of the I. C. C. for 1931, p. 68. In the meantime the enactment of § 15a of the Transportation Act of 1920 has made the need for valuation more imperative than ever. 49 U. S. C., § 15a. . In any work so vast and intricate, what is to be looked for is not absolute accuracy, but an accuracy that will mark an advance upon previous uncertainty. If every doubt as to the extent and form of valuation is to be dispelled by mandamus, the achievement of the ends of Congress, already long.deferred, will be put off till the Greek Kalends.

The judgment of the Court of Appeals of the District of Columbia is reversed, and the judgment of the Supreme Court dismissing the petition affirmed.

*Reversed.*

Mr. Justice Van Devanter, Mr. Justice McReynolds and Mr. Justice Sutherland are unable to concur in this decision. But, as the decision is put distinctly on the ground that the specific duty sought to be enforced by mandamus is not so definitely and plainly described by the statute as to justify the application of that remedy, and the question whether the inventory in controversy, omitting a specific valuation of important rights and interests, gives full or adequate effect to the intent of the statute, is not determined but distinctly reserved for future contestations, they deem it sufficient to say at this time that they regard the reasons assigned by the Court of Appeals for its judgment as sound and requiring an affirmance of its judgment.

The Chief Justice and Mr. Justice Butler took no part in the consideration and decision of this case.