Charles A. Loreto, J.
Both plaintiff New York Central and defendant New Haven on this motion ask for summary judgment. They rest their case on undisputed documents.
The questions involved in this case are of the gravest character, involving consequences of great magnitude. The court has given to them its most earnest and deliberate consideration.
Central, in its complaint, asks for judgment under article 15 of the Beal Property Law: “ 1. That defendant [New Haven] and every person claiming under it be forever barred from all claim or claims to any interest of any kind whatsoever on the property herein described [i.e., The Hotel Biltmore] ”. It also *416 prays for an injunction restraining the New Haven from interfering with its quiet and peaceful enjoyment of the premises.
New Haven in its first counterclaim essentially asks declaratory judgment, also pursuant to article 15 of the Real Property Law, affirming its ownership of an interest in the use of the Biltmore, such interest including (1) the right to join with Central in the construction, holding, maintenance and leasing of the Hotel Biltmore, and (2) the right to reserve a proportionate share of the rentals and other compensation accruing from any lease of the Hotel Biltmore. Other relief is also sought.
This discord or dispute over their respective interest and rights in the Biltmore has come about with the advent of two assertive, highly competitive and strong-willed men as presidents of their respective railroad companies. New Haven asserts that without its approval Central entered into a writing-dated December 8,1958, purporting to be a lease of the Biltmore premises to Realty Company (Central’s subsidiary) for a term of six years and at a rental set unilaterally and arbitrarily by Central and made payable to Central, in violation of New Haven’s rights. New Haven claims that Central, having acted in such highhanded fashion, has denied it the contractual rights it seeks to have affirmed by court decree. Also it declares that Central has deprived it of a credit to the Terminal account of about $1,600,000 with a consequent loss to New Haven of $1,000,000 to date, such amount representing the sum it has been required to contribute to the maintenance and operation of G-rand Central Terminal over and above the amount it would have had to contribute if proper credits had been made to the Terminal account.
It is undisputed that Central, as sole lessor, executed a lease of the Biltmore dated December 8, 1958 to Realty Company for a term of six years at a rental and upon terms fixed by Central. New Haven had refused to approve such a lease and to add its signature to it. It notified Realty that it considered the lease invalid and it likewise communicated with subtenants and concessionaires.
The complaint of Central generally alleges that although prior to May 31, 1957 New Haven had an undivided interest in those premises in accordance with a 1913 Agreement, such interest ceased on that date and that New Haven’s claim to a joint interest is adverse to Central’s exclusive ownership and enjoyment.
New Haven’s answer consists of denials except as to written documents referred to in the complaint. It also sets forth three *417 counterclaims, each covering a separate parcel of property. The motion before the court is addressed solely to the first counterclaim relating to the Hotel Biltmorc property. In brief, this counterclaim sets forth the history of the relationship between the two railroads, the contracts entered into between them, including the “ 1907 Agreement ”, also referred to as “ Terminal Agreement ”, and the “ 1913 Amendment ” agreement. In the light of the history of the relationship and all the agreements between the parties, it alleges that its contractual right ‘ ‘ to join ” in leasing the Biltmorc was denied when Central insisted upon dictating the terms of such leasing and entered into it without its consent or approval. Accordingly, New Haven prays for the declaratory judgment already stated.
New Haven moves for an order dismissing the complaint and directing summary judgment in its favor on its first counterclaim, pursuant to rule 113 of the Rules of Civil Practice, and Central in its' principal opposing affidavit requests summary judgment on its complaint in its favor.
The adjudication of the rights of the parties to this litigation to a considerable extent will determine their rights in the many buildings erected with their joint contributions in the Grand Central Terminal area from 42nd Street to 52nd Street in New York City.
Pointedly, Central takes the position that New Haven’s interest in the Biltmore property ceased in 1957, when it had been fully reimbursed for its advances toward the construction of the hotel and thati£ thereafter New Haven had only the contractual right, if it cared to exercise it, to join in the holding, maintenance, and leasing of the Biltmorc and, if it joined therein, the right to have the rentals of the Biltmore credited to a so-called Terminal account ”.
The rights of the parties are derived from and wholly dependent upon their written agreements entered into over the years. There is no dispute as to what these are and the parties do not claim that they have been modified by any conversations or Avritings not submitted on this application. Since no additional proof would be presented upon a trial and Avhat is involved is a construction or interpretation of the rights of the parties, it is appropriate to consider and determine the matter Avithout a trial.
There is no doubt that the agreements furnish the basis of New Haven’s rights in the Biltmore. The early history of the entry of the Nbav Haven Railroad into New York City and its use of the tracks, facilities and the station terminal at 42nd Street and Park Avenue belonging to the New York & Harlem *418 Railroad Company provides a background for the “ 1907 Agreement ” between Central and New Haven. That history gives the evolution of the Grand Central Terminal and the setting for the “ 1907 Agreement ”.
By agreement dated March 17, 1848, Harlem granted to New Haven the right to run its trains over Harlem’s tracks into Manhattan to its terminus at Fourth Avenue and 26th Street. This continued until 1872 when Harlem, New Haven and Central considered the desirability of their common use of a. railroad station to be located at 42nd Street and Park Avenue. Harlem acquired the land for this station and constructed the Grand Central Depot. By an agreement dated November 1, 1872 (referred to as the 1872 Tripartite Agreement), Harlem leased to New Haven and Central certain tracks, platforms and spaces in the newly constructed depot during their charter terms. Shortly thereafter, by lease dated April 1, 1873, Harlem leased all its properties extending into Manhattan to Central for a term of 401 years, subject to the rights of New Haven under the 1848 Agreement, and Harlem also assigned to Central its rights and obligations under the 1872 Tripartite lease. By an agreement dated March 23, 1899, whereby the Grand Central Depot was altered, reserving specific tracks and facilities for Harlem, it was agreed that the station become a union station in which Central and New Haven would share in common the tracks and facilities of the entire depot.
Following a train collision and fire, the. trains then being operated on the surface and by steam, the New York Legislature by enactments in 1903 and 1904 prohibited the use of steam for trains operated squth of the Harlem River and required the depression of tracks along Park Avenue and the consequent alteration of what was then the Grand Central Depot. When the subject of depressing the tracks from 57th Street to 42nd Street, the operation of electric trains into. Manhattan, and the construction of a new depot arose, Central took the position initially that New Haven would have no right to continue to use the new depot. New Haven insisted that Central could make no change of the existing facilities without its consent.
Then, in order to be assured that Central could not rightfully undertake the project of altering the Terminal and its facilities without its consent, New Haven consulted with Attorney-General George W. Wickersham for his opinion. Mr. Wickersham’s opinion dated December 29, 1905, in which Henry W. Taft com curred, was that, from his study of the agreements, Central would need the consent of New Haven before entering upon any project of altering the Terminal and its facilities. Although *419 Central had begun to construct the new terminal on July 1,1903, it continued its construction pursuant to agreement of the parties, the new facility embracing land between 42nd Street and 57th Street and adjoining avenues.
Thereafter, the superseding “ 1907 Agreement ” was entered into by Central and New Haven. It terminated the rights of the parties under the 1873 Tripartite Agreement. The “ 1907 Agreement ” or “ Terminal Agreement ’ ’, as it is at times referred to, is the primary one between the parties to be considered. It sets forth the basic grant to New Haven in paragraph 3, which reads as follows: “ 3. The Central Company * * * hath demised, let and leased, and by these presents doth demise, let and lease unto the New Haven Company, during the term of the New Haven Company’s charter and all renewals thereof, including the charter of any company which shall operate the present railroad of the said New Haven Company, the use, in common with the Central Company, subject to all the provisions of this agreement, of the said Railroad Terminal for the accommodation of the traffic of the New Haven Company” (italics supplied).
The agreement defines “ Railroad Terminal” as follows: “ 1. The words ‘ Railroad Terminal, ’ wherever hereinafter used, shall mean and include the land, and interests in land, and all improvements thereon (not including the distributing system hereinafter mentioned), and all rights in any ways on which said land may abut, as illustrated and described in Schedules I, II, III, IV and V, hereto attached and hereby made a part of this agreement.” (Italics supplied.) Under it Central obligated itself to acquire land needed for the Terminal, not then owned by it or Harlem. Central was required to make the necessary changes for the construction of a new station — the present Grand Central Terminal. It was stipulated that New Haven’s right to the use of the Terminal should in no event exceed 50% of the maximum traffic capacity. New Haven was required to pay thereunder to Central a fixed part of (1) certain ‘ ‘ fixed charges ” (including interest on cost of the old Grand Central Depot), the cost of acquiring additional land for the Railroad Terminal, and the cost of constructing the Railroad Terminal, and a proportionate part of "(2) “ all net expenditures for the operation of the railroad terminal”. (1907 Terminal Agreement.) The Terminal was to be under the direction of a Terminal manager appointed by the presidents of the Central and New Haven Companies and removable by either.
New Haven’s charter is perpetual and it is not disputed that the Hotel Biltmore is property comprised within the Railroad *420 Terminal and covered by the 111907 Agreement ’ Accordingly, New Haven’s rights in the Terminal property are for the duration of its charter. With the exception of Grand Central Station itself, for their railroad purposes the parties used only the subsurface of the Railroad Terminal area until 1909 when it was decided to utilize the surface, and in 1910 and 1911, pursuant to agreements, they jointly financed the construction of the Merchants & Manufacturers Building and the Adams Express Building.
Shortly after the 1907 Agreement was entered into, the parties executed an amendment thereto dated November 10, 3.913. After some preliminary recitals as to the intent of the parties to construct and lease buildings within the Terminal area, the ‘11913 Amendment ’ ’ agreement states that it is their desire 1 ‘ to express more fully the intent of the parties hereto as to the right of the New Haven Company and the Central Company with respect to the construction, maintenance and use of such buildings and with respect to the rentals accruing from the leasing of such buildings. ’ ’
The agreement then provides: ‘ ‘ The following Avorcls shall be added at the end of Paragraph 3 of said agreement of July 24, 1907, expressing a demise and lease to the New Haven Company Avith the same effect as if they had formed a part of said agreement at the time of the original- execution thereof by the parties hereto
Then the following words are added: “It is understood and agreed that the use of the Railroad Terminal demised by this paragraph to the New Haven Company shall include the right on the part of the Nbav Haven Company to join ivith the Central Company, in accordance with agreements relating thereto, made, or from time to time to be made, by and between the Central Company and the New Haven Company, in the const-miction, holding, maintenance and leasing of buildings ”. (Italics supplied.)
That paragraph further proAddes: “In every such building, together with the right to support thereof, toAvard the construction of Avhich the New Haven Company shall furnish or contribute money, and until it is reimbursed therefor, the New Haven Company shall have and otvn an undivided interest which shall bear the same proportion to the entire building as the amount of money furnished or contributed by the New Haven Company, and for which it has not been reimbursed, bears from time to time to the entire cost of the construction of such building. At the time when the Neiv Raven Company shall be fully *421 reimbursed for all moneys furnished or contributed by it for or toward the construction of any such building, with interest at such rate as shall have been agreed upon, such undivided interest of the New Haven Company shall cease. In all cases in which the New Haven Company and the Central Company shall join in the construction of any such building or buildings, the rentals to be credited to the fixed charges or to the cost of maintenance and operation of the Railroad Terminal under the provisions of Paragraph 14 of this agreement shall include all rentals accruing from the leases of the buildings or parts of buildings so constructed, except such rentals as by agreement between the New Haven Company and the Central Company shall be paid over to the New Haven Company and the Central Company or either of them as a proper return for the moneys advanced by such party to provide for the construction of any said buildings. It is expressly understood and agreed that, to facilitate the raising of money for the construction of such buildings, any rights of the New Haven Company or of the Central Company in such buildings or any of them or any parts thereof and in or to any rentals accruing from the lease of such buildings or any of them or any parts thereof, may be, by agreement between the Central Company and New Haven Company, at any time hereafter, conveyed, assigned or pledged to one or more corporations, associations or trustees.” (Italics added.)
The “ 1913 Amendment ” was intended to embrace the Biltmore already under joint construction, as well as future buildings. Pursuant to the Terminal Agreement and the 1913 Amendment, New Haven and Central joined in the construction of hotel, apartment and business buildings throughout the Terminal area. Eighteen such buildings are enumerated in the affidavit of Mr. Alpert, located on Madison Avenue, Park Avenue and Vanderbilt Avenue, including the Waldorf-Astoria Hotel and the Roosevelt and Commodore Hotels. Through this joint participation the open-faced railroad yard of the turn of the century was radically transformed.
The two railroads contributed equally $5,600,000 for the construction of the Hotel Biltmore. In 1912 it was leased to a third party for a term of 21 years, commencing January 6,1914, with an option to the lessee to renew for an additional 21 years. The Biltmore lease provided for the payment of rentals thereunder to Central and New Haven as lessors.
The original lessee of the Biltmore defaulted in 1934 and possession of the Biltmore was recovered by summary proceedings. The parties then leased the Biltmore to Realty Hotels, *422 Inc., wholly owned by Central, for the term of one year with automatic one-year renewals, subject to the right of either Central or New Haven to cancel the lease on 30 days’ notice, the lessee agreeing to operate the hotel for the joint benefit of the lessors with ‘ ‘ the entire net earnings of the demised premises ” payable to both Central and New Haven as lessors.
It should be noted that title to the name ‘ ‘ Biltmore ’ ’ and to the hotel furniture, 55% thereof to Central and 45% to New Haven, was conveyed by the prior defaulting lessee to both parties.
The dispute, which New Haven terms a breach by Central, came about on December 8, 3958, when the last extension of the Biltmore lease expired. Prior to that date New Haven ha,d advised Central that it would not be interested in renewing and extending the lease to Realty upon termination unless changes were made in the operation of the hotel to the end that the railroads receive a better return by way of rentals and that New Haven receive equal representation on the board of directors of Realty or an equal voice in the management of the hotel.
Significantly, by the end of May, 1957, both railroads had been repaid all advances that they had made to construction of the Biltmore, and from that date until December 8, 1958, rentals received from Biltmore were credited to the Terminal account. Central then, in December, 1958, announced that it would no longer recognize any interest of New Haven in the leasing and management of the Biltmore or in the sharing of its rentals, except for the crediting of a ground rental to the Terminal account, such ground rental being fixed by three appraisers. Central alone then entered into the new lease with its subsidiary Realty Company, which is assailed by New Haven. Immediately after entering into the new lease, which took effect on December 8, 1958, Central and the lessee Realty instituted this suit.
Central contends that New Haven has no property interest in the Biltmore after reimbursement — only a right to join; that New Haven’s property interest in the Biltmore ceased on May 31,1957; that “ New Haven has a valuable right —the right not to join in transactions regarding the commercial buildings in the Terminal area — but once New Haven elects not to join, it cannot subsequently join in future leases of the parcel affected ”. Proceeding from this premise, Central contends that New Haven, not having signed the 1958 lease of Biltmore, has lost any right to join in its leasing in the future — in other words, that New Haven has no further interest or rights in the Biltmore. Its contention that New Haven has no property interest in the Bilt *423 more stems from the provision in the 1913 Amendment to the effect that its ‘1 undivided interest ’ ’ ceases upon full reimbursement of its advances toward construction and upon its assertion that New Haven has lost its right to join in leasing.
What was intended by the words ‘ ‘ undivided interest” in paragraph 3 of the 1913 Amendment might have been expressed with more clarity and precision. However, considered in the light of all pertinent factors, it becomes evident that it refers to something in the nature of an equitable claim or lien implied in. law, arising from New Haven’s advances toward the construction of the Biltmore. It served to put on notice subsequent creditors of Central of this equitable claim of New Haven to the extent that it had not recouped its construction advances.
The court finds that termination of “ undivided interest” is not related to New Haven’s “ right to join ”. Central does not claim that it has denied New Haven the right to join after full reimbursement. It asserts the same right to join was available to New Haven in December, 1958, as it had prior thereto. In other words, New Haven’s right to join was not extinguished or diminished when its “undivided interest” ceased. The words “ undivided interest ” for the purpose used in the agreement havé a limited and circumscribed meaning. Therefore, the significance of this phrase in the present controversy vanishes.
The court now turns to Central’s contention that New Haven’s “ right to join ” merely means “to go along ” with Central if it chooses —that “to go along” with Central means that it must accept all that Central presents and proposes to do and that all that remains for New Haven to do is to add its signature to contract or lease. Of course, by so doing New Haven would be subject to the obligations of the contract or lease and would share in its benefits. But, under Central’s construction of the phrase “ right to join ”, New Haven has no right to offer and require such terms and provisions as it considers wise and desirable for the contract or lease. That is the right New Haven claims it has, contending that otherwise the so-called right may prove to be a hollow one and that all New Haven would be granted is the right to rubber-stamp the contracts and leases Central chooses to make.
The arrangement between Central and New Haven is unusual, if not unique. Central’s attorneys cite as relevant to their contention the case of I. C. C. v. New York, N. H. & H. R. R. Co. (287 U. S. 178 [1932] wherein they state that New Haven’s prior claim of ownership was rejected by the court (Cabdozo, J.), quoting the words of the commission stating that New Haven has only “ qualified privileges of user, falling short of owner *424 ship or full possession of the physical thing ” (p. 191). However, fee title of Central is not contested. But it cannot be gainsaid that New Haven has substantial contractual rights to the Terminal area, although they ‘ ‘ fall short of ownership ’ ’ and do not grant “ full possession of the physical thing ”.
In support of its contention, Central points to three instances, affecting three buildings, No. 466 Lexington Avenue, 230 Park Avenue and 320 Park Avenue, claiming that New Haven, having chosen not to join in their construction, was forever thereafter precluded from joining and that those three examples provide the interpretation of the parties as to the meaning of the words “ to join ”. However, when New Haven declined to join in the construction of two buildings and to continue to join with respect to the third, written agreements were entered into by the parties. Except for settling details as to credits to be made to Terminal account, their net effect was to declare that Central was free to proceed alone and not that New Haven was freed of an obligation or right to join. The court does not believe that what was done in these three instances can be used to give the construction to the phrase that Central proposes. Central embarked upon these projects alone and, of course, enjoys all profits of those improvements and will alone bear any possible loss resulting from them. Those buildings stand apart from the Hotel Biltmore because, as to the latter, New Haven joined in its construction in 1912, sharing equally its total cost.
In seeking the meaning of the words “right to join”, the court may not breathe life into a contract, creating rights and obligations not existing. The phrase is not clearly definitive. While the court may not change the terms of a contract, it may look to the conduct of the parties which tends to fix a meaning to words of doubtful import (Hartigan v. Casualty Co., 227 N. Y. 175).
This right “ to join ” must be considered in the light of the payments New Haven is required to make, not only those relating exclusively to its use of the Terminal and railroad facilities, i.e., proportioned to its freight traffic and not less than $160,-179.92 per year, but also the payment of interest of 4%% upon the total cost previously mentioned. These interest payments continue in perpetuity unless New Haven defaults in making all payments required, in which event, at the option of Central, “ then these presents and the term hereby granted ” shall cease and become void. It may be interjected that “ The mere existence of a clause in a lease imposing the penalty of forfeiture for certain described causes does not change the legal interest of the tenant in the property demised ”. (People ex rel. Muller *425 v. Board of Assessors, 93 N. Y. 308, 312.) Also in determining the meaning of “ right to join ”, the factor of the joint financing of the 18 buildings in the entire Terminal area stands out prominently.
In view of the agreements requiring such large advances of money, can it reasonably be construed that New Haven’s right “ to join ” merely is one “ to go along ” with Central, to rubber-stamp? Is it reasonable to believe that sound, practical, hardheaded railroad executives representing New Haven some 50 years ago would have agreed to a business proposition resulting in its joint financing with Central of 18 buildings in the Grand Central Terminal area, whereby it would commit itself to such large and expensive investments, assuming 50% of the risk of loss and no share of profits, only the return of its investments with interest, while Central, sharing the risk of loss, would take the entire profit? The court would be naive to assume that the present heads of these railroads possess greater business acumen than did their predecessors of half a century ago.
It may be pertinent to point to some indicia of a sharing in the management revelatory of what the parties meant by “to join ” in the management, which would have bearing on what they meant by the words “ to join ” in the leasing, to wit, the composition of the board of directors of Realty. Although a subsidiary of Central, prior to the time when Mr. Alpert became president of New Haven in 1956, Realty directors consisted of three appointed by Central, two by New Haven, and two from outside of both railroads. In 1956 Central appointed five directors of Realty, thereby eliminating New Haven’s active voice in its management. Another straw of the meaning of “ to join ” in management is gleaned from the agreement of the parties wherein the designation of the manager of the Terminal is given to the presidents of New Haven and Central, and the jurisdiction of the Terminal manager was extended by the parties at a joint meeting held on June 9, 1916, to “include inspection and obligation for maintenance as prescribed in the agreements and leases with the lessees of all buildings on Terminal property which are financed either jointly by the two Railroad Companies or through the Realty Company, and that the expense thereof be treated as an operating expense of the Terminal.”
The search in dictionaries and lexicons for aid in determining the meaning of the words “ to join ” is not helpful in the solution of the problem here posed. “ To join ” may be passive in significance or it may denote active participation in formulation of an activity. The court need not explore the countless varied associations in which the phrase might be used, nor conjecture *426 the varied possibilities of its significance. It is clear to the court that this phrase was used in a special sense to apply to an extraordinary situation — an extraordinary vista of entering upon operations of vast magnitude, evolved from long association, framed in written agreements and resulting for half a century in concord. In this setting, the query then is whether the phrase should be given the narrow construction that Central would ascribe to it, or whether it should be given the broader import New Haven asserts.
Where the words used are susceptible to and permit a rational meaning, the court should ascribe such a meaning to them. Central would have the court ascribe a literal meaning to the words. But, as Judge Cardozo pointed out in Outlet Embroidery Co. v. Derwent Mills (254 N. Y. 179, 183): “If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided.”
Central asserts that what is granted to New Haven is the valuable right “ not to join” in any transaction. Was this assertion made with tongue in cheek? Would it have been necessary to write anything in the basic 1913 Amendment Agreement to confer the right not to join? This may almost be considered sheer absurdity. Perhaps Central makes this assertion in order to latch on its sequitur that “ once it [New Haven] elects not to join it cannot subsequently join in future leases ”. This argument is fallacious and entirely beside the point.
It is not inconceivable that any proposal or all proposals by Central could be fruitless and economically meaningless for New Haven. The simple device and means whereby this might be accomplished could be the use of a subsidiary wholly owned by it (Central), granting to the subsidiary the most favorable terms, thereby permitting the latter to enjoy greater benefits and profits than it otherwise would if the lease Were made between parties dealing at arm’s length, which indirectly would all go to Central and none to New Haven. It is not suggested that this was the intent and scope of the 1958 lease to Realty, although New Haven insists that a much better deal could be obtained.
It is not what has been done to jeopardize any rights of New Haven but what could be done under the interpretation of the phrase “to join”, claimed by Central, that tends to bring to light its true meaning. “ To give the words in question the meaning attached to them by the courts below [here by Central] is to place the plaintiffs [here New Haven] in a matter purely of business wholly at the mercy of others with whom they were contracting.” (Russell v. Allerton, 108 N. Y. 288, 292.) And *427 “ Resort to a literal construction may not be had where the result would be to thwart the obvious and clearly expressed purpose which the parties intended to accomplish or where such a construction would lead to an obvious absurdity (Silverstein v. Metropolitan Life Ins. Co., 254 N. Y. 81) or place one party at the mercy of the other (Russell et al. v. Allerton, 108 N. Y. 288, 292).” (McGrail v. Equitable Life Assur. Soc., 292 N. Y. 419, 424; see, also, Reliable Press v. Bristol Carpet Cleaning Co., 261 App. Div. 256.)
With an appreciation of the tremendous building operations to be shared, the advances toward their construction, plus New Haven’s annual payment in perpetuity of 4%% interest on the cost of construction and maintenance of the Terminal, to the extent of its use thereof, without more, would it be reasonable to assume that the parties intended that New Haven’s right to join would be such a possibly sterile one? Would they have prepared and executed the “ 1913 Amendment ” to spell out a barren right? In December, 1958, Central took that position.
In support of its position, and opposing and as if forbidding the entertaining of New Haven’s interpretation of “to join” to mean to have a voice, Central argues * ‘ Inevitably there are differences of outlook and judgment between the two railroads. Central never has, does not, never will, and could not agree that New Haven’s concurrence should be necessary. For the result would be deadlock time and again and the repeated loss of extremely valuable business opportunities.” The prospect of a deadlock in the resolution of any problem or program is not a factor that should be considered by the court. That predicament, if it were to come about, is inherent in any situation where a decision is to be made by two or an equal number of persons ; and wherever practicality and reason prevail, it is surmounted.
In view of all pertinent factors bearing upon the issue, the court is of the opinion that in this case the right “ to join ” means more than merely “to go along ”; that there is implied the right to be admitted in council, to participate in the treaty and to agree upon terms before embarking upon the venture and executing the instrument of lease or contract.
Since Central’s argument also declares that New Haven has lost all right to share rentals of Biltmore, not having joined in the 1958 lease, the court will now consider that point.
Throughout the history of the dealings between the parties following the construction of buildings jointly financed and thereafter leased by them, it was invariably stipulated in the agreement that, after full reimbursement to New Haven of its advances toward construction, rentals would be credited to the *428 fixed charges or cost of maintenance and operation of the Railroad Terminal. This survival of New Haven’s right to share rentals after reimbursement is indicated in the agreements covering the buildings constructed in 1910 and 1911, by the 1912 Biltmore Rent Agreement, by the 1935 Biltmore Rent Agreement, by the letter of Central dated May 20,1957, to which New Haven agreed, by the agreement in regard to 466 Lexington Avenue of New Haven (in which New Haven did not join in financing its construction), and finally by the additional conduct of Central in crediting the rents of the Biltmore to the Terminal account after May 31, 1957, when New Haven was fully reimbursed for its construction outlays.
“ Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.” (Old Colony Trust Co. v. Omaha, 230 U. S. 100, 118.)
Lastly, the court will turn to the claim made by Central in broad support of its point that New Haven has no property interest in the Biltmore, that its only rights are subsurface.
It may be said that there is an inconsistency in Central’s position that New Haven’s rights are only in the subsurface of the Terminal area as it recognizes an obligation to credit and provides a credit annually to the Terminal’s account of a certain sum specified as ground rental of the parcel on which the Biltmore stands. The court is of the opinion that the basic demise in 1907 did not limit New Haven to subsurface and the 1913 Amendment was an integration with it aimed retrospectively and prospectively.
Sig’ht should not be lost of the basic grant under the 1907 Agreement whereby Central “ demised, let and leased ” to New Haven in perpetuity the entire Terminal area for use in common with Central. Although thereby New Haven’s use is for its railroad traffic, such use is not limited to subsurface or surface and includes above surface. To name but a few services that may be provided above surface, which are associated with or may be considered incidental to railroad passenger traffic, are the providing of restaurants, automobile parking facilities and hotel accommodations. “ Railroad purposes include such a variety of uses as changes in circumstances may bring about, depending upon the facts in each case. The use, if reasonably necessary, is generally sustained.” (Mitchell v. Illinois Cent. R. R. Co., 384 Ill. 258, 264; see Missouri-Kansas-Texas R. R. Co. v. Freer, 321 S. W. 2d 731, 738 [Missouri], for annotations of variety of legitimate railroad uses.) These services or uses, *429 including trackage and railroad offices above the ground surface, all of which come within the permissible use granted to New Haven by the 1907 demise and lease, would present a difficulty, if indeed not act as a barrier, to any attempt by Central to proceed alone with any alteration of existing structures or the erection of new ones on any of the land within the Terminal area. Therefore, Central could not with freedom and impunity think of and proceed to erect above the surface of any portion of the Terminal area without the consent and approval of New Haven. It may be said that Central to the extent that it would not interfere with New Haven’s rights could for itself devote the Terminal area to uses other than railroad traffic. However, the likelihood of conflict if this were attempted without first obtaining clearance from New Haven is apparent. The eminent attorneys, Wickersham and Taft, many years ago expressed their legal opinion that Central required the approval of New Haven to alter the then existing Terminal facilities.
The right “to join with the Central Company * * * in the construction, holding, maintenance and leasing of buildings ’ ’ recited in the 1913 Amendment is merely a statement of what in reality was an existing right under the basic 1907 Agreement. For the 1913 Amendment was prepared only in order ‘1 to express more fully the intent of the parties ” as to that right. The title to the 1913 Amendment does not as claimed by Central govern or delimit its context. There is no support for the title in the body of the agreement. Only in the event New Haven elects not to join in a lease or construction, expressing its consent that Central do so alone, would New Haven not have the right to use in common with Central for its railroad traffic, in the extended sense of the term already indicated, that part constructed upon or leased of the Railroad Terminal area which includes “.the land, and interests in land, and all improvements thereon”. For all practical purposes Central could not with impunity alone embark upon any venture affecting the land and improvements thereon.
The court disagrees, with Central’s contentions — that the 1907 demise and lease to New Haven is limited to the subsurface of the Terminal area except for the G-rand Central Station, that New Haven no longer has any right to join in the leasing or management of the Biltmore and that New Haven’s right to join is one without a voice therein.
The court concludes and finds to the contrary — that the 1907 demise and lease to New Haven is not limited to the subsurface of the Terminal area except for the Grand Central Station; that when New Haven’s “ undivided interest ” mentioned in the 1913 *430 Amendment ceased, it did not extinguish nor diminish New Haven’s right to join; that New Haven has a right to join the leasing and management of the Biltmore; that New Haven’s right “ to join ” is one with a voice and that, in regard to the 1958 instrument of lease of the Biltmore executed by Central alone, New Haven has been wrongfully denied its right to join.
Accordingly, New Haven’s motion for summary judgment on its first counterclaim is granted in accordance with the intendment of this decision and Central’s cross motion for summary judgment is denied. Settle order on reasonable notice providing for relief not inconsistent with this opinion.