**UTAH POULTRY & FARMERS COOPERATIVE**

v.

**UNITED STATES et al.**

Civ. A. No. C 8–53.

United States District Court
D. Utah, Central Division.

March 10, 1954.

Irwin Clawson, Salt Lake City, Utah, for plaintiff.

Paul E. Blanchard, Chicago, Ill., for intervenor Armour & Co.;

John P. Staley, Chicago, Ill., for intervenor Swift & Co.;

Walter D. Matson, Washington, D. C., for intervenor Department of Agriculture.

H. D. Lowry, Asst. U. S. Atty., Salt Lake City, Utah; Charles S. Sullivan, Jr., and James E. Kilday, Special Assts. to Atty. Gen., for defendant United States.

Edward M. Reidy, Chief Counsel, and Allen C. Crenshaw, Associate Chief Counsel, Washington, D. C., for Interstate Commerce Commission.

Bryan P. Leverich, Salt Lake City, Utah, J. Edgar McDonald, New York City, William F. Zearfaus, Philadelphia, Pa., for intervening railroads.

Before PICKETT, Circuit Judge, and RITTER and KNOUS, District Judges.

RITTER, District Judge.

The complaint seeks to have the Interstate Commerce Commission order of February 4, 1952,[1] approving special regulations of rail carriers covering claims of damage to shell eggs, set aside, annulled and enjoined.

Jurisdiction[2] of this court to review the order, and venue of the parties, are admitted except as to the prayer for a mandatory injunction against the Commission and its eleven members, whose official residence is the District of Columbia and who are not within the venue of this court.

It is admitted that this court has jurisdiction to hear and decide as to the lawfulness of the Commission action and its order. The questions of lawfulness here involved relate only to the Commission orders and not to the tariff filed after the orders became effective, which

---

1. No. 30030, Special Regulations—Eggs, Vol. 284 I.C.C. page 377.

2. 28 U.S.C.A. §§ 1336, 2284, and Chapter 157.

would be a different proceeding before the Commission and the court.[3]

The plaintiff, Utah Poultry and Farmers Cooperative, is a farmers cooperative marketing association incorporated under the laws of Utah [4] engaged among other things in marketing eggs. Armour and Company, Swift and Company, and the Secretary of Agriculture of the United States have intervened as plaintiffs herein and join in the attack upon the Commission order. The statutory defendant, the United States of America, claims in its answer that the Secretary of the Army represented the United States as a shipper in the proceedings before the Commission, and, in furtherance of its assault upon the Commission order, admitted all of the allegations of the complaint. At the hearing the Justice Department lawyer stated that the United States "confessed error".

■ The claims of departments of government other than the Interstate Commerce Commission are entitled to no more weight and consideration than are the same claims in the complaint of the private parties. The Attorney General does not have authority to "confess error" and thereby to dispose of this action.[5]

■ The Interstate Commerce Commission is vested with the only legal authority to administer the Interstate Commerce Act. It has exclusive authority in this field. Neither the Department of Agriculture, Department of the Army, or the Department of Justice (or all of them) has any authority superior to the Commission to decide for the government the questions raised by this action.[6]

The proceeding before the Interstate Commerce Commission was instituted on the Commission's own motion, by its order of July 23, 1948. One hundred and thirty-one railroad companies, parties to the tariff schedules, were named respondents therein. And, all of those railroad companies have intervened as parties defendant in the suit in this court, and now defend the Commission order.

Hearings were held by the Commission at Washington, D. C., September 23, 1948; Chicago, Ill., July 26, 27, 1949; Brooklyn, N. Y., December 15, 1949; Washington, D. C., February 8, 1950; Los Angeles, Calif., August 1, 1950, and Chicago, Ill., September 7, 1950, at which counsel for respondent railroads, Department of Agriculture, Defense Depart-

3. The tariff was filed August 7, 1952, after the entry of the order herein of February 4, 1952, and after its effective date of July 1, 1952. It was filed after the last petition for reconsideration on April 20, 1952, and after final termination of the proceedings before the Commission, and therefore is not a part of the Commission record herein. If considered by any court it would be by a regularly constituted district court in an action against a carrier, based upon that tariff. Consideration of that tariff in this action would be beyond the jurisdiction of this statutory three judge court which is limited to enforce, enjoin, set aside, annul, or suspend "any order of the Interstate Commerce Commission".

4. Ch. 1, Title 3, Utah Code Ann.1953.

5. 28 U.S.C.A. § 2323 provides: "The Interstate Commerce Commission and any party or parties in interest to the proceeding before the Commission, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party." and; it further provides: "The Attorney General shall not dispose of or discontinue said action or proceeding over the objection of such party or intervenor, who may prosecute, defend, or continue said action or proceeding unaffected by the action or nonaction of the Attorney General therein."

6. 49 U.S.C.A. § 12(1) provides: "The Commission is hereby authorized and required to execute and enforce the provisions of this chapter; and, upon the request of the commission, it shall be the duty of any United States attorney to whom the commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this chapter and for the punishment of all violations thereof".

ment, various producer organizations, and shippers, appeared and submitted testimony of witnesses, and exhibits. The record compiled at these hearings consists of 1,067 pages of testimony and 60 exhibits, many of elaborate statistical data, tables, and charts. Following the hearings briefs were submitted by counsel for respondent railroads, Secretary of Agriculture, Secretary of the Army, National Poultry, Butter and Egg Association, New York Mercantile Exchange, Fairmount Foods Co., Zenith Godley Co., and four packing house companies.

An examiner's proposed report was filed and served on all parties on April 25, 1951, recommending, for reasons therein stated, that the Commission find that the then 5 percent tolerance on eggs, other than those rehandled and repacked at the rail point of origin, was not shown to be unreasonable or otherwise unlawful, and that the proposed tolerance of 4 percent on eggs packed at the rail point of origin and 6 percent on those packed at other than rail points of origin, had not been justified, but that tolerances of 3 and 5 percent, respectively, would be reasonable. Exceptions were filed to the examiner's proposed report. Oral arguments by counsel were heard by the Commission on October 26, 1951.

Thereafter the report and orders of February 4, 1952, here involved, were entered by the Commission. Petitions for reopening, reconsideration, and reargument were filed and were denied by the Commission.

The report of February 4, 1952, discontinued the original proceeding and required the suspended schedules to be cancelled without prejudice to the filing of new schedules in conformity with the findings therein, viz., that tolerances of 3 percent on eggs packed at the rail point of origin, and 5 percent on those packed at points other than rail points of origin, would be reasonable. Railroad respondents filed schedules, as per-

mitted by the Commission report, effective on and since August 7, 1952.

The complaint alleges that respondents' schedules, which became effective August 7, 1952, purport to free railroads from all liability for loss of eleven eggs per case on shipments repacked at origin, or 18 per case on shipments not repacked at origin, or 4 per case on government inspected cases, and therefore violate the provisions of Section 20(11) of the Act.[7] The complaint further alleges that "in approving and accepting the tariff", the Commission failed or refused to enforce and observe provisions of the Act. And the complaint alleges that the decision of the Commission is unlawful, on the grounds (a) that findings of fact are unsupported by substantial evidence, and contrary to record evidence, (b) that conclusions of law are not supported by findings of fact, and (c) that conclusions are based upon fact findings wholly irrelevant and immaterial to any issue, and that the decision lends color of authority for legality of tariff provisions in effect, which are unlawful and in violation of Section 20(11) of the Interstate Commerce Act.

Intervening complaint of the Secretary of Agriculture claims as the only Commission error that the carrier damage tolerance rules, approved by the Commission, are attempts to limit common carrier liability and, as such, are void as a matter of law under Section 20(11) of the Interstate Commerce Act, that there is no factual basis of record to support the tolerance percent approved, and that, if the damage tolerance rules are valid, approval thereof for nationwide application is unsupported by substantial evidence or adequate findings.

The Problem Before The Commission

The Commission was confronted here with complex and difficult questions, of great importance to railroad transportation over the nation. Claims by shippers against carriers for damage to shell

7. 49 U.S.C.A. § 20(11).

eggs had increased greatly. Claims throughout the country increased from about $110,000 in 1941 to an all time peak of $2,338,462 in 1947. Claim payments in the latter year were relatively greater for damage to eggs than to any other commodity. The shell egg carload traffic originated in 1947 was only 0.072 percent of all carload traffic, while the claim payments for damage to eggs was 1.91 percent of all claim payments.[8]

The claim payments on eggs in that portion of the United States north of the Ohio and Potomac rivers between the eastern seaboard and the Mississippi River were 2.32 percent in 1941, 7.02 percent in 1943, 16.16 percent in 1945, and 38.41 percent in 1947 of the aggregate railroad revenue on this traffic. In the latter year the total claim payments in this territory amounted to $1,444,-453.00.[9]

The following table compiled from Exhibit No. 6 of the record before the Commission sets out the loss and damage per car and per $100 gross revenue on shipments of shell eggs, as compared with other commodities throughout the entire country in 1947:

| Commodity | Loss and damage | |
|---|---|---|
| | Per car | Per $100 Revenue |
| Shell eggs | $83.72 | $21.20 |
| Melons | 52.80 | 15.11 |
| Sewer pipe, et cetera | 19.57 | 13.16 |
| Crockery and earthenware | 29.20 | 9.10 |
| Furniture (new) | 10.23 | 4.38 |
| Grain | 3.45 | 1.42 |
| Meats, fresh and cured | 3.41 | 1.13 |
| Plumbers' goods | 14.06 | 4.35 |

A study made by the railroads and introduced in evidence by the Commission shows that claims were filed on 58.0 percent of all carloads of shell eggs delivered at New York, Philadelphia, Baltimore and Boston during 1947. The study also shows that the percentage that such claims were of the total revenue received on the shell egg traffic to those cities during the year mentioned is as follows:

| | |
|---|---|
| New York | 50.5 |
| Philadelphia | 11.7 |
| Baltimore | 15.8 |
| Boston | 12.2 |
| Total | 41.7 |

At the conclusion of the first hearing at Chicago, after listening to the testimony concerning the extraordinary damage claim payments on shipments of shell eggs, Interstate Commerce Commissioner Mitchell, who was hearing the case, said at page 364 of the record:

"We will proceed to New York. We have but one desire in mind, of course, and that is to see if we can't remedy a condition which seems to us should be remedied. That is our sole purpose in this investigation, to help the shippers and to see that the railroads receive fair compensation for hauling eggs."

Where such an immense volume of traffic, running into thousands of cars and millions of cases of eggs, 284 I.C.C. 377, 386, and such tremendous freight charges and damage claim payments, running into millions of dollars, 284 I. C.C. 377, 387, are involved, the economic stability of carriers and the maintenance of an adequate national system of railroads, were substantially affected. It is the exclusive responsibility of the Commission, under the National Transportation Policy,[10] to foster sound economic conditions in transportation and among carriers "to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of commerce of the United States, of the Postal Service, and of the national defense."

Many interests are here concerned including farmers, consumers, the nation-

8. 284 I.C.C. at page 399.

9. Id.

10. 49 U.S.C.A. notes preceding sections 1, 301, 901, and 1001.

al defense. They and all other elements in our economy are deeply interested in the maintenance of an adequate national transportation system.

Anything endangering the efficient operation of railroads inevitably will be injurious to us all.

### The Alternative Remedies Are Unpromising

The Commission sought a remedy. The problem of claims against railroads for damage to egg shipments had been before the railroads and the Commission for many years and never satisfactorily solved. It is extremely difficult of solution. It constitutes a part of the whole problem of the rate structure, which courts many times have held requires the experience and judgment of the Commission.

The Commission could not expect the railroads to continue to take these losses. That was uneconomic to the point of being injurious to the national railroad transportation system and to the public interest. That, also, in effect, was a means of obtaining involuntary rebates contrary to one of the most fundamental underlying principles of the Interstate Commerce Act, i. e., to insure uniformity and to avoid unjust discrimination.[11]

The Supreme Court of the United States, in Lowden v. Simonds, etc., Grain Co.,[12] said:

"Under Section 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service in connection with the transportation of property.[13] That section forbids the carrier from giving a voluntary rebate in any shape or form. This Court has had occasion recently to sustain action of the Commission aimed at carriers' practices resulting in collection of less than the tariff rate.[14] It is equally important to aid the efforts of a carrier in collecting published charges in full.[15] Involuntary rebates from tariff rates should be viewed with the same disapproval as voluntary rebates."

Rate increases were not the remedy. That would have imposed a greater cost upon shippers throughout the nation than the present regulation. That would have been more unjust for it would penalize some shippers for the benefit of others. That would not have benefited the shippers of eggs. That would tend to cause the railroads to lose all of the business.

The limitation of the regulation to the four eastern cities where most of the damage claims to eggs arise, we are informed was tried and failed.

It is not unjust to apply the regulation nationwide. A shipper whose eggs suffer no damage is not hurt. The tolerance applies only if there is damage. If throughout the nation relatively small claims of damage were made by some shippers it would follow that there would be comparatively small or insignificant reductions under the regulation. And, it is a reasonable assumption from the Commission's exhaustive factual studies, that generally some amount of damage was in the crates at the time they were delivered to the carrier.

One suggestion is that Congress enact remedial legislation. This would seem to be undesirable and impracticable for a number of reasons. There are important considerations which seem to require the retention of the provisions of Section 20(11) in the Act. No one has.

11. New York, New Haven & Hartford R. Co. v. I. C. C., 200 U.S. 361, at page 391, 26 S.Ct. 272, 50 L.Ed. 515.

12. 1939, 306 U.S. 516, at top of page 521, 59 S.Ct. 612, 614, 83 L.Ed. 953.

13. Act of Feb. 4, 1887, 24 Stat. 379, 381, as amended, 49 U.S.C.A. § 6(7).

14. Baltimore & Ohio R. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318.

15. Cf. Pittsburgh, C., C. & St. L. Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151; New York Central & Hudson River R. Co. v. York & Whitney Co., 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016.

suggested that it be repealed in its entirety. The provision has proved to be a beneficent one. Congress has developed a policy for solving these problems by reliance upon the expertness and experience of the Commission rather than upon the saving clauses enacted by itself to take care of the cases as they arise. History has shown us that it is better to develop a rule by the common law method of deciding the cases as they arise and thus carving the principle out by the light of experience.[16] Particularly is this true where as here the matter is one calling for the judgment of an administrative body of experts to pass upon issues of fact. If it is bad policy for the Commission to limit carrier liability *a fortiori* it is bad policy for the legislature to do so. The courts will draw the line when the suggested horrible, atrocious or monstrous situations shall arise from any claimed abuse of administrative discretion.

### The Evidence

What then, in such a situation, is the Interstate Commerce Commission to do?

It instituted an investigation with a view to making findings and prescribing reasonable rules, regulations, and practices relative to the transportation of shell eggs.

That investigation developed that there is a certain minimum amount of damage in every crate of eggs when it is delivered to the carrier. That damage consists of checked, cracked and broken eggs. That damage also consists of unavoidable further loss arising from those checked, cracked and broken eggs, and from inherent defects in the eggs at the time of delivery to the carrier.

The brief filed herein by the intervening railroads summarizes the evidence. It is noteworthy that much of it came from witnesses from the United States Department of Agriculture, an intervening plaintiff herein. The brief sets out the evidence as follows:

"The evidence before the Commission proved conclusively that it is humanly impossible to handle shell eggs without some breakage (138, 257, 258, 263).[17] Crystal clear statements to this effect came from the witnesses from the United States Department of Agriculture, an intervening plaintiff here.

"Mr. Henry G. F. Hamann, Chief of the Dairy and Poultry Inspection and Grading Division, Production and Marketing Administration, United States Department of Agriculture, was placed upon the stand by Mr. Walter Matson, the attorney for the United States Department of Agriculture, and, at pages 256 and 257 of the record, testified as follows:

"'Commr. Mitchell: Mr. Hamann, I notice in your Exhibit No. 20, as I read this, your department provides for tolerance permitted in these grade AA eggs of 7.5, is that right?

"'The Witness: That is correct, sir.

"'Commr. Mitchell: That includes checks?

"'The Witness: Yes, sir, that includes all tolerances, all tolerance for edible eggs.

"'Commr. Mitchell: And on grade A, you permit 11.7 percent?

"'The Witness: Yes, sir.

"'Commr. Mitchell: So you do recognize that there must be a tolerance in the grading of eggs?

"'The Witness: There is a tolerance in the grading of eggs, sir, because it is not humanly possible to remove from any lot of eggs in the candling or grading process all defective eggs.

---

16. The question was put to Lord Nottingham, "Where will you stop if you do not stop here? And his answer was, "I will tell you where I will stop; I will stop wherever any visible inconvenience doth appear." The Duke of Norfolk's Case, Charles Howard v. Duke of Nor-folk, Court of Chancery, 1682. 3 Ch. Cas. 1, 26.

17. The figures in parentheses refer to pages of the transcript of testimony taken before the Interstate Commerce Commission.

" 'Commr. Mitchell: Does that include also cracked eggs?

" 'The Witness: Yes, sir.

" 'Commr. Mitchell: You say, then, it isn't humanly possible to eliminate all the cracked eggs that you would find in cases?

" 'The Witness: That is correct.

" 'Commr. Mitchell: All right.

" 'The Witness: The tolerances are set up primarily for the purpose of making allowance for human error.'

"Further on pages 257–268 the following colloquy took place between Mr. Hamann and his counsel:

" 'Q. (By Mr. Matson) You say that it is impossible to eliminate every checked and cracked egg from a case in the process of grading and inspection of eggs? A. Yes, sir.'

"And still further at page 263 of the transcript Mr. Hamann testified as follows:

" 'Q. You pointed out it was humanly impossible, or at least impractical, to pack a perfect car. You have never seen a perfect car, have you? A. No, sir, I haven't.

" 'Q. Then there is a normal expectancy of shell damage in every car that is loaded, is there not? A. Yes, sir.'

"Another witness placed upon the stand by the attorney for the United States Department of Agriculture was Mr. Hermon I. Miller, Chief of Research Division of the Poultry Branch, Production & Marketing Administration, United States Department of Agriculture (283). He made studies with respect to damage to shell eggs at the request of the Interstate Commerce Commission (295). Mr. Miller stated that when eggs from the farm are delivered to the packer 5 percent of them are in a checked condition (shell cracked but membrane unbroken) upon arrival at the packing plant. Of this 4 percent existed at the time the eggs left the farm,

and 1 percent more became checked while traveling to the packer's plant (283, 289, 297, 446, 447). In addition to the 5 percent of the eggs which were in a checked condition, 12 percent more also showed shell damage consisting of stains and dirties (296, 297). The witness stated that the eggs are reworked at the packer's plant and that when they left the shipping point the eggs showed 1.9 percent checks and 1.4 percent stains and dirties, a total of 3.3 percent (297). This testimony was given by Mr. Miller at the hearing in Chicago on July 27, 1949. After further tests he corroborated it at a subsequent hearing which was held at Brooklyn, N. Y., on December 15, 1949, his testimony, which appears at pages 444 and 445 of the record with respect to this point, being as follows:

" 'Q. At the Chicago hearing you presented exhibits Nos. 22 and 23 and you indicated at page 294 of the record that, "We have some other material for 1948 that we haven't got summarized yet that we will throw into this when we get it completed".

" 'Have you made some subsequent checks, since the Chicago hearing?

" 'A. Yes, Mr. Matson. That was with regard to the amount or the type of egg that was going into cases in mid-western shipping points and the type coming out at destination, and we have examined the complete records and our testimony will stand as presented in Chicago.

" 'Q. As I recall that testimony, at pages 269 to 298 of the transcript, you found that there were packed into the cases at origins 1.9 per cent checks? A. That is right.

" 'Q. And 1.4 per cent stains and dirties. Do your subsequent tests that you have run on this material and other material bear you out in those figures? A. They do.'

"The study in which this witness of the Department of Agriculture expressed confidence was described by him at page 286 of the record as follows:

" 'The third source of material consists of data on 115 cars secured by our own staff members in 1948 and 1949. In these records we made careful inspections of eggs at points of origin as they were to be loaded into railway cars, marked the sample cases inspected at this point, and re-inspected these same cases and the same eggs at destination. This exhibit should typify the average quality and condition of eggs that are packed in railroad cars for shipment from midwestern points.'

"The result of the study described in the above quotation is set forth at page 3 of Exhibit No. 22, and shows the shell damage prior to rail shipment as follows:

| | |
|---|---|
| Stains and dirties | 1.4 |
| Checks | 1.9 |
| Loss | 0.1 |
| Total | 3.4 |

"The reason for the confidence which the Department of Agriculture representative had in the above figures is stated by him at pages 287 and 288 of the record, as follows:

" 'Now, I have more faith in those figures than I would have otherwise because if you look in the middle page between those two tables you find the report on the 737 cars selected at random from the inspection and grading reports, and I think you will agree that to a considerable extent the total or average column for origin and grading reported on this page agrees with the origin grading for the 115 cars. That gives me confidence to a certain extent that the figures on the 115 cars are rather representative.'

"The study with respect to the 737 cars, to which the Department of Agriculture witness referred covers eggs from all parts of the country (296). It appears at page 2 of Exhibit No. 22 and contains the following breakdown:

| | |
|---|---|
| Stains and dirties | 1.8 |
| Checks | 1.9 |
| Loss | 0.2 |
| Total | 3.9 |

"Mr. Hamann, the aforementioned Chief of the Dairy and Poultry Inspection and Grading Division, Production and Marketing Administration, of the United States Department of Agriculture, stated that approximately 10 percent of the total volume of commercial eggs produced throughout the nation are graded by the Department (238, 240), and that the certificates issued by the Department at the time of the grading show that there is a normal expectancy of shell damage at origin (263).

"An examination was made by the railroads of 1,002 origin inspection certificates of the Department of Agriculture which revealed that 18,437 cases of eggs were included in the 1,002 cars examined at shipping point with the following results:

"3.04 percent of the natural eggs (eggs before oil dipping) were found to be checked and/or stained.

"3.22 percent of the processed eggs were found to be checked and/or stained (105).

"The railroads' study of the Department of Agriculture certificates which developed that 3.22 percent of eggs shipped have shell damage at origin is a remarkable substantiation of the study made by the Department of Agriculture in response to the request by the Commission.

"The railroads also submitted the results of studies of inspections made by them at rail shipping points (105). These studies showed that there is shell damage of one kind or other in every car regardless of whether or not the

eggs had just been rehandled and re-packed or had been hauled over the high-ways various distances before loading into the rail freight car. The result of this research is summed up as follows:

| From | Year | No. of cars | Percentage Damage |
|------|------|-------------|-------------------|
| Indiana | 1947 | 74 | 2.2 |
| " | 1948 | 30 | 3.2 |
| " | 12/4/48 to 2/19/49 | 22 | 2.8 |
| Iowa | 1947 | | 2.57 |
| " | 1948 | | 2.46 |
| Minnesota | 1947 | | 1.81 |
| " | 1948 | | 2.84 |

"The results of another railroad study made at shipping point were given in Exhibit No. 15 and at page 196 of the record as follows:

"'We adopted a program of taking 15 cases and inspecting 100 eggs to determine how many eggs were checked, broken, stained and dirty. The statement shows that we made inspection on 60 cars and we developed through that process that we used 2,256 checks, 98 broken, or a percentage of 2.61.'

"Shipping point studies made by railroad representatives indicate that shell damage before rail transportation is chargeable to the following factors in the order of their importance, not one of which is attributable to the railroads: *First,* the inherently fragile nature of eggs. It is generally conceded by all parties acquainted with the commercial handling of eggs that a certain amount of shell damage is inescapable. This normal expectancy of damage starts at the nest and, depending upon the strength of the individual shell, continues progressively until the egg is used by the consumer. *Second,* the handling of the eggs in the candling and repacking operations. Checks (cracked eggs with unbroken membrane) develop in any oil dip processing of the eggs, and eggs are broken when the egg case is lidded. *Third,* the handling by the shippers of the packed egg cases to and into freight car. Very often there is no supervision of the handling of the packed cases in the car. Sometimes unskilled or itinerant labor, with apparently no previous training, is used by the shippers to load the cars, and with no supervision on the part of the owner of the eggs in promoting careful and proper loading (106, 107).

"The condition of a damaged egg never gets better, but always gets worse with handling. Not only is there a worsening during transportation of the condition of the eggs which were in a damaged condition at the time they were received by the railroads, but those eggs also cause damage to others which had been sound. (197). At page 3 of the Department of Agriculture's Exhibit No. 22 is set forth the results of studies made by it with respect to 115 carloads of eggs delivered on all parts of the east coast, the Gulfport cities, and the west coast (287, 450). Included among them were 12 cars which went to New York City (450). One study was of the condition of the 115 carloads at point of origin and the other study was of the condition of the same 115 carloads at destination after they had received rail transportation. The difference between the number of stains and dirties and checks at destination, and the number of stains and dirties and checks at origin, was found to be 1.5 percent. The witness said that this figure was supported by 8,000 additional cars, using the following language at page 449:

"'A. Fifteen cases to the car, a hundred eggs in each case, 115 cars supported by approximately 8,000 additional cars.

" 'Q. These are all rail tests? A. All rail tests.' "

Experience With Tolerance Rules

Tolerance rules in connection with damage claims arising out of the transportation of shell eggs have been in effect for 37 years and with the approval of the Interstate Commerce Commission for 34 years.

■ Settled administrative construction, long standing approval by the Interstate Commerce Commission of tolerance rules, and compliance in practice, in connection with damage claims incidental to the transportation of shell eggs are entitled to great weight.

In United States v. Chicago North Shore & M. R. Co.,[18] the Supreme Court of the United States said:

"It would be difficult indeed to conceive a clearer case of uniform administrative construction of section 20a as applied to this company. Conceding that the proper classification of the railway is not free from difficulty, all doubt is removed by the application of the rule that settled administrative construction is entitled to great weight and should not be overturned except for cogent reasons. New York, N[ew] H[aven] & H[artford] R. Co. v. Interstate Commerce Comm., 200 U. S. 361, 401, 26 S.Ct. 272, 50 L.Ed. 515; Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121; Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Fawcus Machine Corp. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L. Ed. 397; Interstate Commerce Comm. v. New York, N. H. & H. R. Co., 287 U.S. 178, 53 S.Ct. 106, 77 L.Ed. 248.

"The primary responsibility rested upon the Commission to determine whether under the circumstances the railroad was required to procure leave under section 20a

for the issuance of securities. Evidently entertaining serious doubts on this question, it has for more than a decade resolved them in favor of the carrier, and the company and its officers have acted in reliance on the administrative tribunal's construction of the statute. At this late day the courts ought not to uphold an application of the law contradictory of this settled administrative interpretation."

The Commission's report in National Poultry, Butter & Egg Assn. v. N. Y. C. R. R. Co., 52 I.C.C. 47, discloses at pages 48 and 49 that tariff tolerance rules in connection with damage claims on shell eggs had been in effect in the east as early as February, 1916, or more than 37 years ago. The Commission's approval of a tolerance rule, as it is set forth in the case just cited, dates from January 21, 1919, or over 34 years ago.

Prior to that the Commission approved tolerance rules in connection with grain in Crouch Grain Co. v. A. T. & S. F. Ry. Co., 36 I.C.C. 265, decided October 5, 1915, and 41 I.C.C. 717, decided November 10, 1916. In the last mentioned case the Commission approved the lawfulness of a tariff rule which provided that in the adjustment of claims for loss allowances for natural shrinkage to be deducted from the claims there should be ⅛ of 1 percent on wheat, flax seed, rye, oats and barley, and ¼ of 1 percent on corn.

In the foregoing case the Commission held that limitation of liability was "not against losses *caused by the carrier or its connections,* but rather against liability for losses *due to the inherent nature of the commodities themselves* and attributable to no human agency."

Tolerance regulations of carriers and the principles, with reference to the inherent nature of commodities, were recognized by the Commission and courts long before the egg proceedings here involved. In Weight Tolerance Rule, 192

18. United States v. Chicago North Shore & M. R. Co., 288 U.S. 1, last par. page

13 and par. top of page 14, 53 S.Ct. 245, 248, 77 L.Ed. 583.

I.C.C. 71, 77, the Commission approved the tariff regulation providing weight differential on coal, due to moisture evaporation or precipitation, inherent in that commodity. In Fuel Sales Corp. v. Delaware, L. & W. R. R. Co., 225 I.C. C. 288, 291, the Commission granted reparations based upon loss in weight of washed anthracite coal between point of origin and destination, covering a greater percent loss than allowed under the carrier tariff rule, both the Commission decision and carrier rule being based upon moisture evaporation inherent in the commodity.

Tolerances such as here serve a useful, practical and lawful purpose. They are arrangements of the kind which Mr. Justice Brandeis had in mind when he said in Luckenbach v. W. J. McCahan Sugar Refining Co.: [19]

"It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice."

Furthermore, the United States Department of Agriculture and the trade have provided tolerances for the normal expectancy of shell damage to eggs in grading. And the Army of the United States when making its inspection of shell eggs grants allowances for shell damage.

### Interpretation of Section 20(11)

▆ The contemporary construction of an act is entitled to great weight in its interpretation. The provision in question, viz., Section 20(11) was interpreted in a proceeding by the Commission in 1915. Upon the urging of interested parties a hearing was held and the Commission interpreted the newly enacted Cummins Amendment.[20]

Railroads, Chambers of Commerce, merchants and traffic associations, and shippers participated in the proceeding. After carefully considering numerous suggested proposals and interpretations, the report stated its construction of the Amendment, which is deemed pertinent to questions here raised, and is quoted. At page 691–692, it is stated:

"It seems clear that these provisions are, in common with the other matters governed by the amendment, confined to instances of loss, damage, or injury caused by the carriers. * * * In the interest of thorough understandings and to avoid controversies it is very desirable that these rules be uniform for all the carriers of the country." At page 695 it is stated: "There is, however, no inhibition as to the limitation of the liability of a carrier for losses not caused by it or a succeeding carrier to which the property may be delivered. * * * From this it follows that under the amendment a contract or a tariff may lawfully limit to a reasonable maximum the liability of a carrier for losses which it does not cause. * * *" (p. 596.)

"The liability provided by the rates so established by the Commission is applicable no less to instances of loss or damage chargeable to the negligence of the carrier than to those occasioned by causes beyond the carrier's control."

The United States Supreme Court early interpreted the Carmack Amendment as follows: [21]

"What is the liability imposed upon the carrier? It is a liability to any holder of the bill of lading which the primary carrier is required to issue 'for any loss, damage, or injury to such property caused by it,' or by any connecting carrier to whom the goods are delivered. The suggestion that an ab-

19. 248 U.S. 139, 149, 39 S.Ct. 53, 55, 63 L.Ed. 170.

20. In re The Cummins Amendment—33 I.C.C. 682 (1915).

21. Adams Express Co. v. Croninger, 1913, 226 U.S. 491, 503, 506–507, 33 S.Ct. 148, 152, 57 L.Ed. 314.

solute liability exists for every loss, damage, or injury, from any and every cause, would be to make such a carrier an absolute insurer, and liable for unavoidable loss or damage, though due to uncontrollable forces. That this was the intent of Congress is not conceivable. To give such emphasis to the words, 'any loss or damage,' would be to ignore the qualifying words, 'caused by it.' The liability thus imposed is limited to 'any loss, injury, or damage caused by it or a succeeding carrier to whom the property may be delivered;' and plainly implies a liability for some default in its common-law duty as a common carrier."

### The Commission Action Is Within The Congressional Grant Of Authority. And, It Does Not Limit Carrier Liability In Violation Of Section 20 (11).

Power has been granted the Interstate Commerce Commission by Congress in the broadest possible terms to decide the matters in this transportation controversy.

The Act[22] requires railroads to publish tariff schedules, including "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered".

The Act[23] also authorizes the Commission, after hearing and determination that any "regulation", among other provisions, "is or will be unjust or unreasonable * * * or otherwise in violation of any of the provisions of this chapter", to "determine and prescribe * * * what * * * regulation * * * will be just, fair, and reasonable, to be thereafter followed".

The method of removing from a damage claim filed on shell eggs that portion of the damage for which the railroads are not responsible is a prac-

tice over which the Interstate Commerce Commission is given jurisdiction in broad language.

The restraint imposed upon the carriers and the Commission by Section 20(11) of the Act is not broad, but is in terms narrowly limited. That section refers to carrier liability for any loss, damage or injury, "caused by it". Neither the Act nor the common law makes the carrier liable for damage which it does not cause. A statute which purported to do so would present serious constitutional questions. The liability which the carriers and Commission are forbidden by Section 20(11) to limit is a liability for damage caused by the carrier.

Hence, on the one hand power is granted the carriers and Commission in the broadest terms, while on the other hand the restraint upon their power is couched in carefully restricted language.

To deny the Commission authority to do what it here has done is to drop out of Section 20(11) of the Act, the restrictive language "caused by it" and to limit the broad grant of powers which the United States Supreme Court consistently has recognized that the Commission possesses. To strike the tolerance regulation down requires us to go a long way. Surely, it is hardly to be said consistent with well accepted principles of statutory construction.

Courts have harmonized provisions of the Act to regulate commerce in order to give full effect to the purpose of the statute to prevent involuntary rebates, discriminations and other practices which the act was intended to remedy. In Arkansas Fertilizer Co. v. United States,[24] the court says:

"In construing remedial statutes, especially those of a generic character, courts have not hesitated to restrict and modify the ordinary meaning of words and phrases, and even of entire paragraphs, in order to harmonize conflicting or incon-

---

22. 49 U.S.C.A. § 6.

23. Section 15, see also Section 13(2).

24. Com.Ct., 193 F. 667, particularly the last par. on page 670.

sistent provisions and so enable all of them to contribute in proper degree to the object sought to be accomplished. Instances of this kind are too familiar to require citation. Indeed, the Supreme Court, in the Abilene Case (Texas & Pacific R. Co. v. Abilene Cotton Oil Co.), 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, declared that a right of action as old as the common law had been taken away by the act to regulate commerce, since otherwise full effect could not be given to the purpose of that statute to prevent discriminations. Bearing in mind how rarely suits were brought to recover damages for excessive railroad charges, and how easily collusive delay in the payment of freight bills could be utilized, as the Commission points out, to give preferences which are actual rebates, it seems well within precedent to reject petitioner's contention and to uphold a construction under which, as Commissioner Lane observes:

" 'The act becomes workable and enforceable from the standpoint of shipper, carrier, and the Commission itself.' "

The Interstate Commerce Commission does not base its approval of the tolerance rule, in whole or in part, upon any kind of limitation of carrier liability, but on the contrary, bases that approval upon a finding of fact that the regulations "are directed against losses due to the inherent nature of shell eggs *rather than against losses caused by the carrier*. These regulations merely establish a means to determine the amount of damage existing at the time the shipment is received by the carrier, and the amount of damage resulting . . . during transportation solely because of the inherent nature of the shipment." [25]

No one contends that carrier liability may be reduced, lessened or limited contrary to the provisions of Section 20(11) of the Act.

Losses caused deliberately, wilfully, maliciously and intentionally by the carriers or their agents, or due to their negligence, or to accidents in transit, such as broken cases, damage to entire carload, and the breakage of large numbers of eggs in a shipment, are not limited by these regulations. They purport only to exempt the carrier from losses the carrier does not cause. That is the whole basis of the report.

■ The question before us is whether these carrier regulations which seek to avoid liability for loss *not caused by them* are reasonable. To determine the reasonableness of such a regulation requires the experience and knowledge of transportation conditions possessed by the Commission.

This is the kind of a question Congress intended the Commission to have the authority to determine.

The Interstate Commerce Commission and the carriers contend that there is a certain minimum amount of damage in every crate of eggs when it is delivered to the carrier. The Commission has made its findings of fact as to what that minimum damage is. The evidence supports those findings. Indeed, the findings are corroborated by United States Department of Agriculture and War Department practices in grading shell eggs. And, much of the evidence comes from Department of Agriculture witnesses themselves, examined by their own attorney.

The Commission problem herein was to decide the extremely complex questions posed by the rail regulations, seeking to avoid damage liability relating to shell eggs, which was inherent with that fragile commodity and that part of the damage which is not due to carrier action or negligence. As shown by the report *consideration of evidence*,[26] eggs inherently have certain defects which are not revealed by customary inspections at origin points, and sometimes not by the most careful candling process. Despite the efforts of the past to im-

25. 284 I.C.C. 377, 383.

26. 284 I.C.C. 377, 384, 385.

prove methods of packing and inspection it is recognized by experts,[27] including the Department of Agriculture, that some small percent of undisclosed damage exists in all cases of eggs, increasing in percentage as they move from farms to packing plant, to points of loading on cars, in the loading process, in transit, and at point of unloading. It would appear most difficult to determine with accuracy the portions of such damage which exist at the time of delivery to carriers, occurs during transit, or results from shipper inspection at destination. The report,[28] found that the slightest movement in transportation may cause additional damage to such eggs, which cannot be imputed to carrier negligence, but rather to the inherent nature of the commodity.

■ The task of regulating interstate commerce has been vested in the Commission. Congress has manifested a general legislative purpose to establish a system of administrative control. And that system has been progressively expanded. So that the principle now is well recognized that "the Commission is the tribunal to which the tasks of regulation have been expressly committed, and that the courts will restrict their power of censorship to the condemnation of abuse of authority".[29]

■ The crux of this lawsuit is the Commission holding [30] that the regulations as to tolerance are not limitations of carrier liability, but are tariff rules designed to relieve carriers from paying damage claims which are not attributable to their negligence or other fault.

This is a question of fact relating to the application of the provisions of the Act, which legally can be decided only by the Commission and when so decided with substantial support of record evidence will not be disturbed by the courts.[31]

In I. C. C. v. Union Pacific R. Co., supra, 222 U.S. at pages 547–548, 32 S.Ct. at page 111, the court made its classic statement of principle as follows:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Illinois Cent. R. Co. v. I. C. C., 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

An analogy to the instant case, and a close one, is found in controversies as

27. Id., 391, 392, 394, 395.

28. Id., 402.

29. Sharfman, The Interstate Commerce Commission, Vol. II, p. 389, published by the Commonwealth Fund Legal Research Committee; Chief Justice White in Interstate Commerce Commission v. Illinois Cent. R. Co., 1910, 215 U.S. 452, at page 470, 30 S.Ct. 155, 54 L.Ed. 280; Justice Lamar in Interstate Commerce Commission v. Union Pacific R. Co., 1912, 222 U.S. 541, at pages 547–548, 32 S.Ct. 108, 56 L.Ed. 308.

30. 284 I.C.C. 377, at page 401.

31. I. C. C. v. Union Pacific R. Co., 222 U.S. 541, 547–548, 32 S.Ct. 108, 56 L. Ed. 308; Mississippi Valley Barge Line Co. v. U. S., 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260; Board of Trade of Kansas City v. U. S., 314 U. S. 534, 546–548, 62 S.Ct. 366, 86 L.Ed. 432. See also, National Labor Relations Board v. Hearst Publications, 322 U.S. 111, top of page 131, 64 S.Ct. 851, 88 L.Ed. 1170.

to whether rates and other practices are unreasonable or discriminatory. Sharfman, supra, at page 424, summarizes the results of the cases:

"Recognizing that the tasks of regulation have been vested in the Commission and that judicial review is restricted, essentially to the issue of legal power, the courts have declined to assume jurisdiction over all determinations involving the exercise of administrative discretion. Such determinations have been treated as 'questions of fact' to be freely and finally established by the Commission in its application of the general standards laid down by statute. The problem has arisen most frequently in connection with controversies as to whether rates and practices are unreasonable or unjustly discriminatory. The Commission's findings in such proceedings embrace not only the primary objective, or evidentiary facts disclosed by the record, but the conclusions drawn therefrom as ultimate facts. In both processes administrative judgments are reached. Conflicting or inconclusive testimony may necessitate the resolution of doubt as to the evidentiary facts; and even if there were no dispute as to the evidentiary facts, the conclusions drawn therefrom as ultimate facts—that the rates or practices at issue are unreasonable or unjustly discriminatory—necessarily constitute an expression of judgment. The courts seldom distinguish between evidentiary facts and ultimate facts, except that the latter category is sometimes referred to as involving, not merely 'questions of fact', but 'mixed questions of fact and law'; both groups of findings are held to be free from judicial interference. *In these circumstances, and assuming the absence of errors of law, judicial review is confined to a determination as to whether there is evidence to support the administrative conclusions, regardless of whether the courts would themselves reach the same conclusions.* In other words, the element of judgment or discretion which inheres in the administrative method is allowed free play, and determinations which reflect such judgment or discretion are clothed with finality." (Emphasis supplied.)

Many subsequent court decisions have continued the basic standard in I. C. C. v. Union Pacific R. Co., supra, which the Commission has followed in its consideration and determination of rail rate matters. With practical unanimity the decisions have held that Commission determinations, with respect to complicated rate matters, are in part the exercise of sound discretion and experienced judgment, which courts will not disturb where orders are supported by substantial evidence. As stated in Virginian Ry. Co. v. United States, 1926, 272 U.S. 658, 665–666, 47 S.Ct. 222, 225, 71 L. Ed. 463:

"The finding of reasonableness, like that of undue prejudice, is a determination of a fact by a tribunal 'informed by experience.' Illinois Central R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128. This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it."

In Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260, the Court held that "The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form", and added:

"The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. In this instance the care and pa-

tience with which the Commission fulfilled its appointed task are plain, even to the casual reader, upon the face of its report."

In a later case, Board of Trade of Kansas City v. United States, 314 U.S. 534, 546–548, 62 S.Ct. 366, 372, 86 L. Ed. 432, the Court stated, in connection with the Commission authority and judicial review of Commission action in respect to rail-rate cases, that

"The process of rate making is essentially empiric. The stuff of the process is fluid and changing —the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems. Cf. Railroad Commission [of Texas] v. Rowan & Nichols Oil Co., 310 U.S. 573, 581, 582, 60 S.Ct. 1021, 1024, 84 L.Ed. 1368.

\* \* \* \* \* \*

"We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission. It is not for us to tinker with so sensitive an organism as the grain rate structure only a minor phase of which is caught in the record before us. If we were to grant the relief sought by the appellants, we would be restoring evils which the exclusive rate-break adjustment was designed to remove—evils which, for all we know, would be far more serious than those complained of by the appellants."

In a still later case, State of New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207, 1231, 91 L.Ed. 1492, the Court quoted with approval from the Commission report in Class Rate In-

vestigation, 1939, 262 I.C.C. 447, 693, a statement of considerations found necessary and applied to decisions as to rate reasonableness, such as herein involved, as follows:

" 'Discretion and flexibility of judgment within reasonable limits have always attended the use of costs in making of rates. *Costs alone do not determine the maximum limits of rates. Neither do they control the contours of rate scales or fix the relations between rates or between rate scales. Other factors along with costs must be considered and given due weight in these aspects of rate making.*' (Emphasis supplied.)"

That quotation in part accounts for the Court opinion statement on the same page, as follows:

"We start, of course, from the premise that on a subject of transportation economics, such as this one, the Commission's judgment is entitled to great weight. *The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal.*" (Emphasis supplied.) [32]

### Conclusion

I. The Commission's power to act in the case at bar depends upon the existence of a fact. That fact is whether damage within the limit of the 3 percent and 5 percent tolerances is caused by the carriers.

 The Commission has made a finding, which is supported by the evidence, that such damage is not caused by the carriers.

32. See also Rochester Telephone Corp. v. U. S., 307 U.S. 125, 59 S.Ct. 754, 83 L. Ed. 1147; Western Paper Makers' Chemical Co. v. U. S., 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941; U. S. v. Wabash R. Co., 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827; U. S. v. United States Smelting, Refining & Mining Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750.

Under the decisions that finding may not be disturbed if it is supported by substantial evidence.

The Commission's power to act in many other cases depends upon the existence of fact. The Supreme Court, in Interstate Commerce Commission v. Union Pacific R. Co., supra [222 U.S. 541, 32 S.Ct. 111], said:

" * * * it has been settled that the orders of the Commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. *But questions of fact may be involved in the determination of questions of law,* so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power."

Questions of fact are involved in the determination of other questions of law. (1) Whether a rate is so low as to be confiscatory, and therefore in violation of the Constitution; and (2) whether rates and practices are unreasonable or discriminatory, and therefore in violation of the statute, are familiar examples.

In these instances, also, Commission findings of fact are binding upon the courts if supported by substantial evidence.

Fundamentally, there is no difference between the finality of the Commission's finding of the fact upon which the rule of law depends in these cases and the finality of the Commission's finding that the damage, within tolerance limits, is in the crates when delivered to the carriers.

██ The narrow concept of judicial review reflected in the Supreme Court decisions is based upon the recognition of the general legislative intent that the Commission shall be the controlling regulative tribunal in its field of special jurisdiction, and as the single expert agency deliberately created for effectuating large public ends in its specific sphere.

II. Courts continue to have the power to protect shippers against wilful, malicious, negligent or other damage to eggs caused by the carriers. Those cases will be decided when they arise. This is in the best common law tradition. When the question was put to Lord Nottingham, "Where will you stop if you do not stop here", his answer was, "I will tell you where I will stop: I will stop wherever any visible inconvenience doth appear." (Supra, Note 16.)

██ III. In the present. case, no shipper is compelled to accept the 3 percent and 5 percent tolerances approved by the Commission and published in the tariff. The shippers are afforded an opportunity to have the exact amount of point of origin damage determined and used. The regulations afford the shipper an opportunity of presenting an inspection certificate of federal or state inspection agencies showing the extent of the physical damage to the eggs determined at the rail point of origin of the shipment immediately prior to tender for rail transportation. To the damage shown in such certificates would be added 1 percent for further damage in transit due to the inherent nature of the eggs, and the total thus computed would be deducted from the claim against the railroad for damages found to exist at destination for which the railroad might be liable.

The Interstate Commerce Commission has heard the testimony of experts appearing on both sides of the controversy and has taken and analyzed page after page of testimony and numerous statis-

tics. As an administrative body of experts, the Commission has exercised its judgment and has found that based upon the record before it tolerances of 3 and 5 percent would be fair and reasonable for application throughout the country.

IV. The method, approved by the Commission, of removing from a damage claim filed on shell eggs that portion of the damage for which the railroads are not responsible does not limit carrier liability in violation of Section 20 (11) of the Act.

The broad grant of power to the Commission should not be cut down.

The language "caused by it" should not be dropped out of Section 20(11), in reference to the liability of a carrier which may not be limited for loss, damage or injury.

The Commission found the fact that the tolerances do not include damage caused by the carriers.

That finding is supported by substantial evidence.

And, the Court is bound by that finding under the authorities.

The regulation here involved is fair and reasonable.

The regulation constitutes a part of the whole problem of the rate structure, which requires the expert experience and judgment of the Commission.

The tariff in this case is not a limitation or liability; it is no more than a factual determination of damage to eggs which is not caused by the carrier.

V. The Commission's findings of fact are supported by substantial evidence.

Judgment will be entered for the defendants, who are directed to prepare findings and conclusions and judgment pursuant to the foregoing opinion.

KNOUS, District Judge (dissenting).

The Utah Poultry & Farmers Cooperative, a Utah corporation, brought this suit against the Interstate Commerce Commission and the United States to set aside and annul an order of the Commission which approved as reasonable a five per cent. damage tolerance on eggs shipped by railroads and not processed at the rail point of origin, and a three per cent. tolerance on eggs processed at the rail point of origin, 284 I.C.C. 377, and to enjoin its enforcement. The Secretary of Agriculture of the United States filed a motion to intervene as a party plaintiff. The United States was a statutory defendant and in opposing the damage tolerance rule is represented here by representatives of the Department of Justice. In order to present its interest as a shipper, the United States in its answer admitted each and every allegation of the complaint and asked for the same relief as the plaintiff. Since the plaintiff is seeking to enjoin the enforcement of an order of the Interstate Commerce Commission, the proceeding is required to be heard and determined by a district court of three judges. 28 U.S.C.A. § 2325.

The Interstate Commerce Commission on its own motion instituted an investigation of the reasonableness and lawfulness of the special regulations governing descriptions, marks, inspection and delivery, and the handling of claims in connection with the transportation, in interstate or foreign commerce, of shell eggs from, to, and between points in the United States with a view to making findings and presenting reasonable rules, regulations, and practices relative to such transportation.

Prior to July 24, 1948, the rules and regulations governing the transportation of eggs were those which became effective July 15, 1919. Under those rules and regulations, no inspection of the contents of cases containing eggs was permitted at Boston, New York or Philadelphia when no cases showed external evidence of damage; or the cases had not been recoopered in transit; or no part of the lading had shifted; or the lading had not been transferred in transit from one car to another. At all other points the consignees were permitted to lift the lids of twenty-five per cent. of the cases, not exceeding twenty in one shipment, and examine the top

layers for damage. If damage to the contents was disclosed by such inspection, the rules permitted further examination of the top layers of other cases selected by the consignee. All cases containing damaged eggs were then set aside for reconditioning. The tariffs have not been basically changed since 1918.

The prior regulations required shippers of eggs to note on the shipping order and bill of lading the character of the shipment. These classifications included rehandled and repacked eggs, checked or dirty eggs, and others which were not specifically classified in connection with egg shipments except storage packed eggs, storage packed dirties, and rehandled and repacked eggs. If not more than five per cent. of the eggs were damaged, no claim was allowed. This five per cent. allowance was referred to as a tolerance. Where the damage exceeded five per cent., claims were allowed for all damage in excess thereof if the examination showed carrier liability. The tolerance applied only in connection with eggs described on the shipping order and bill of lading as current receipts and rehandled current receipts. On shipments of storage packed eggs, storage packed dirties, and rehandled or repacked eggs, claims for actual damage as evidenced by a notation made on a freight receipt by the inspectors was allowed. Under the former regulations, the carriers were paying large payments for damage to shipments of shell eggs. In an effort to improve the situation certain changes in the regulations were proposed and were permitted to become effective by the Commission. On July 24, 1948, the instant proceeding was instituted to test the validity of these regulations.

The proposed regulations differed principally from the old regulations in the following respects: (1) They authorized the opening by the consignee of each package in the shipment, and (2) they substituted tolerances of four per cent. and six per cent. respectively, on shipments of eggs of all descriptions whether placed in packages at the rail point of origin of the shipment or at points other than the rail point of origin. The requirements under the old regulations that shippers must note on the shipping order and bill of lading the description of the shipment were eliminated in the proposed regulations.

After extensive hearings the Commission found that five per cent. tolerance on eggs, other than those rehandled and repacked at the rail point of origin, was not unreasonable or unlawful. The Commission further found that the proposed tolerances of four per cent. on eggs packed at the rail point of origin, and six per cent. on eggs packed at points other than the rail point of origin were not justified, but that tolerances of three per cent. and five per cent., respectively, would be reasonable.

In the course of its report the Commission states at page 383:

"Respondents are not attempting by the proposed regulations to limit carrier liability, in that they are directed against losses due to the inherent nature of shell eggs rather than against losses caused by the carriers. These regulations merely establish a means to determine the amount of damage existing at the time the shipment is received by the carrier and the amount of damage resulting solely during transportation because of the inherent nature of the shipment."

The plaintiff, the Secretary of Agriculture and others opposing the tariff allege that the damage tolerance rules approved by the Commission are attempts to limit common carrier liability and are, therefore, null and void as a matter of law because they are contrary to the provisions of 49 U.S.C.A. § 20 (11),[1] and ask this court to hold unlaw-

1. This section provides in part: "Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia

ful and set aside the Commission's report, and to direct the Commission to reject and to strike from its tariff files the damage tolerance rules approved by its report.

The intervening railroads [2] contend that there is no limitation of liability involved, and that, therefore, Section 1 (6) and not Section 20(11) applies, and deny that the Commission's order is unreasonable or without support in the evidence. They further contend that the provisions of the tariffs are just and reasonable practices affecting the classification of eggs established by them in compliance with their duty imposed by virtue of Section 1(6) of the Act.[3]

The issue presented is whether the order approving a tolerance tariff was a limitation of liability prohibited by the Carmack Amendment. Section 20(11) of the Interstate Commerce Act. The railroads and the I. C. C. concede that if it is a limitation of liability it is in-

valid. They say, however, that tolerance damage rules and practices are designed to relieve carriers from paying claims for damages which are not attributable to the negligence of the railroads or caused by them. In other words, it is the fixing of a damage which is due to the inherent character of eggs, one which is the natural result of producing, packing and moving eggs and for which the carrier is not responsible.

The tariffs approved by the Commission provide in part:

"Upon arrival at destinations of shipments of 'current receipts' or 'graded' eggs in CL or LCL lots, consignee or his authorized representative shall have the privilege before eggs leave the possession of carrier and under supervision of carrier's representative, of lifting the lids of twenty (20) cases in any carload, or of twenty-five per cent. (25%) with a maximum of twenty

to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; " * * * for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company * * * notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Inter-State Commerce Commission; *and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void*: * * * (Emphasis supplied.)"

2. One hundred and thirty-one railroads intervened as parties defendant to this proceeding.

3. This section provides: "It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful."

(20) cases, of the cases of any LCL lot chosen by him, and of examining the top layer thereof for the purpose of ascertaining the actual damage in that case.

"If such examination shows five per cent. (5%) or less damage, it shall be considered complete and final for the entire shipment, and a good order receipt shall be required of consignee.

"If such examination, however, discloses more than five per cent. (5%) damage, consignee shall have the right to make further examination of shipment and to set aside all cases containing more than five per cent. (5%) damage. Joint inspection of all such cases set aside shall be conducted by representative of carrier and consignee, or his representative, and extent of damage, together with facts pertaining thereto, shall be noted on paid freight receipt or other document and signed by joint inspectors.

\* \* \* \* \* \*

"Section 6.—In connection with shipment of eggs, except storage packed eggs, storage packed dirties, and rehandled and repacked eggs, if not more than five per cent. (5%) of the eggs are damaged, no claim will be allowed. Where damage exceeds five per cent. (5%), claims shall be allowed for all damage in excess of five per cent (5%) if investigation develops carrier's liability.

"Each case shall be used as a unit, provided information is furnished the carrier by joint inspection or otherwise of the damage in each case. In other instances, the consignment shall be the unit."

The position of the Railroad and the I.C.C. is plausible and practical, but I am unable to arrive at a conclusion that the tariff is not a limitation on their liability to shippers of eggs. Eggs are not inherently perishable. Checked and cracked eggs, when properly handled, can be shipped interstate without further damage and can be sold to consumers. External force must be applied to such eggs, as well as to perfect eggs, before they are damaged to the extent that they become unmarketable or claims made for damage.

The order does not authorize or approve a regulation which states that the presence of five per cent. or less of damaged eggs is not evidence by itself of negligence, or that unless negligence is proved by the shipper, he cannot recover for five per cent. of his damages. The tariff provides that when damage exceeds five per cent. claims shall be allowed for all damage in excess of five per cent., if investigation develops carrier liability. In all damage claims a shipper may recover only his loss less the tolerances provided for. Thus, one shipper who sends a carload of eggs containing two per cent. checked or cracked eggs, collects the same amount as another shipper who sends a carload of eggs, five per cent. of which are checked or cracked, if the contents of both cars are destroyed or damaged as a consequence of the carrier's negligence. A shipper might ship two cases of eggs from the lot, one car having a five per cent. damage, the other none. The consignee would accept the undamaged car at full price and the shipper would lose five per cent. of the value of the second car. To me it appears inescapable that such results limit the liability of the carrier and violate the prohibition of Section 20(11) of the Act.

This proceeding is not analogous to the cases cited by the defendants.[5] There the shippers sued the carriers for damages to certain perishables and the court fixed a tolerance on the basis that

5. Bronstein v. Baltimore & O. R. Co., D.C.E.D.Pa., 29 F.Supp. 837; Meltzer v. Pennsylvania R. Co., D.C.E.D.Pa., 29 F.Supp. 840; Meltzer v. Baltimore & O. R. Co., D.C.E.D.Pa., 38 F.Supp. 391.

"there will always be a certain amount of damage which can not be avoided even by the most careful handling" and that it was necessary "to fix a norm or limit of tolerance, within which the presence of damaged melons in the cars will not amount to proof of negligence."[6] Bronstein v. Baltimore & Ohio R. Co., supra, 29 F.Supp. at page 839.

I have no doubt but that the courts have the power to fix a tolerance if the evidence warrants it in a particular case, but the Commission does not have that power generally to fix a tolerance in all cases because Section 20(11) prohibits the execution of any contract, receipt, rule or regulation which exempts a carrier from liability. Although I am reluctant to so decide, it appears to me that to hold otherwise paves the way for the establishment of damage tolerance for all commodities shipped and permits allowance which should be determined in courts of law.

I think the order of the Interstate Commerce Commission in Numbers 5792 and 30030, entitled "Special Regulations, Eggs" should be set aside and annulled.

6. The concept of negligence has entered into the liability of carriers after the passage of the Cummins Amendment to the Interstate Commerce Act. The last two provisos of the amendment read: "Provided further, That it shall be unlawful for any such common carrier to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of claims than ninety days and for the filing of claims for a shorter period than four months, and for the institution of suits than two years: Provided, however, That if the loss, damage, or injury complained of was due to delay or damage while being loaded or unloaded, or damage in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery." Act of March 4, 1915, 38 Stat. 1196, 1197, c. 176 amending the Interstate Commerce Act of February 4, 1887, c. 104, 24 Stat. 379, as amended by Sec. 7 of the Act of June 29, 1906, c. 3591, 34 Stat. 584, 593.

In Chesapeake & O. R. Co. v. Thompson Mfg. Co., 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 654, the Supreme Court held that a shipper's failure to give written notice of a claim to the carrier would bar the shipper from recovery for damage to its goods unless it could bring its case within the terms of the final proviso. The Court also held that the negligence referred to in the Cummins Amendment did not mean liability without fault, but negligence in fact, and that an instruction to the jury that if the damage to the shipment was not due to an act of God or the public enemy or to the inherent condition of the goods, they might return a verdict for the shipper, was erroneous because it resolved the issue of negligence in the shipper's favor.

The second proviso to the effect that no notice is required if damage is caused in transit by carelessness or negligence was omitted in the 1930 Amendment. Act, April 23, 1930, 49 U.S.C.A. § 20 (11). See Historical Note to 49 U.S. C.A. § 20(11).